Gene A. FOLDEN, Coastal Communications Associates, and Judith A. Longshore, Plaintiffs,

v.

UNITED STATES, Defendant.

No. 01–456C.

United States Court of Federal Claims.

March 28, 2003.

**44**

Robert G. Kerrigan, George W. Estess, Kerrigan, Estess, Rankin & McLeod, LLP, Pensacola, Florida, for the plaintiffs. Russell D. Lukas, George L. Lyon, Jr., Lukas, Nace, Gutierrez & Sachs, Chartered, of counsel.

Patricia M. McCarthy, Commercial Litigation Branch, Civil Division; David M. Cohen, Director; Robert D. McCallum, Jr., Assistant Attorney General, United States Department of Justice, for the defendant. Roberta L. Cook, Office of General Counsel; Susan L. Launer, Deputy Associate General Counsel, Federal Communications Commission, of counsel.

## OPINION

HORN, Judge.

Plaintiffs, Gene A. Folden, Coastal Communications Associates and Judith A. Longshore, have filed a complaint against the United States, based on actions taken by the Federal Communications Commission (FCC). Plaintiffs allege that the FCC breached implied-in-fact contracts with the plaintiffs to award seven cellular licenses by lottery, and also violated the Takings Clause of the Fifth Amendment to the Constitution by abrogating plaintiffs' contract rights without compensation. Plaintiffs together seek an aggregate amount of $144,088,000.00, divided on the basis of the fair market value of the individual licenses, as well as interest and attorneys' fees. The defendant filed a motion to dismiss for lack of jurisdiction, or, in the alternative, for failure to state a claim upon which relief can be granted.

## FINDINGS OF FACT

According to the complaint, for the purposes of issuing cellular licenses, the FCC divided the United States into two types of geographic markets, metropolitan statistical areas and rural service areas (RSAs). In each market, the FCC granted two competing licenses, one to a "wireline" operator, an established local telephone company, and the other license to a "non-wireline" operator, any party other than an established local telephone company. This case involves the awarding of cellular licenses in seven RSA markets to non-wireline operators.

Pursuant to the Communications Amendments Act of 1982, the FCC was authorized to employ a random selection process to select licenses for certain communications services it regulated. *See* 47 U.S.C. § 309(i) (1982). In 1984, the FCC adopted rules to grant cellular licenses by random selection,

or lottery. 47 C.F.R. §§ 1.821, 22.33 *et seq.* (1984); *see also In re Amendment of the Commission's Rules to Allow the Selection from Among Mutually Exclusive Competing Cellular Applications Using Random Selection or Lotteries Instead of Comparative Hearings,* 98 F.C.C.2d 175, 175, 1984 WL 251081 (1984). According to the rules in place in 1988, the year the events in this case commenced, an applicant that was selected through the lottery process was deemed a "tentative selectee." 47 C.F.R. § 1.823(a) (1988). Selection in the lottery did not necessarily ensure the grant of a license. Before awarding the license, the FCC reviewed the tentative selectee's application to ensure qualification under the agency's cellular application rules. 47 C.F.R. §§ 1.822(a), 1.823(a) (1988).

In 1988, each of the plaintiffs submitted applications to the FCC for cellular licenses in certain RSAs, along with a $200.00 filing fee. Gene A. Folden applied for a cellular license in the Florida 11–Monroe (Fla.11) RSA and submitted a $200.00 filing fee. Coastal Communications Associates (Coastal) applied for cellular licenses in the following seven RSAs: North Dakota 3—Barnes (N.D.3); Minnesota 11—Goodhue (Minn.11); Texas 21—Chambers (Tex.21); Arkansas 9—Polk (Ark.9); Puerto Rico 5—Ceiba (P.R. 5); Pennsylvania 4—Bradford (Pa.4); and Fla. 11. Coastal paid $1,400.00 in application filing fees. Finally, Michael D. Longshore, the now deceased husband of plaintiff Judith A. Longshore, applied for licenses in the following four RSAs: N.D. 3; Minn. 11; Tex. 21; and Pa. 4. Mr. Longshore paid $800.00 in application filing fees.

The cellular license lotteries were held in 1989. Tentative selectees, none of whom were the plaintiffs, were chosen for the seven RSA markets at issue. Subsequently, however, these initial, tentative selectees were disqualified for a variety of reasons, including findings of ineligibility to be licensees. Therefore, the licenses were not awarded to any of the original seven tentative selectees, and their applications were ultimately dismissed.

The procedure to be followed upon disqualification of a tentative selectee was modified in 1988. Before May, 1988, the rule in effect stated that after the selection of a tentative selectee, alternates were selected from the remaining applicant pool:

> The random selection shall pick a tentative selectee and then repeat the random selection process with the remaining applicants, so that, in the event that the tentative selectee's application is denied, the other applicants will be ranked in order as alternative selectees.... If the tentative selectee is disqualified, or its application designated for hearing, the Commission will allow Petitions to Deny against the next-ranked tentative selectee.

47 C.F.R. § 1.823(a)-(b)(2) (1988). This rule was modified, effective May 18, 1988, to give the Common Carrier Bureau Chief and its Managing Director the authority to determine the number of alternates to be selected, if any, on a case-by-case basis. *See* 47 C.F.R. § 1.823(a) (1989); *see also Amendment of Section of Part 1 of the Commission's Rules as They Apply to Applications to be Included in Public Land Mobile and Cellular Lotteries,* 53 Fed.Reg. 52,425 (Dec. 28, 1988). The modified, May 18, 1988, rule stated in pertinent part:

> The designated Lottery Official shall select the winning applicant from among mutually exclusive applicants. The Lottery Official may select in rank order a number of additional applicants. The number of additional applicants selected will be determined by the Chief of the Common Carrier Bureau and the Managing Director.... If the tentative selectee is disqualified, or its application designated for hearing, the Commission will allow Petitions to Deny against the next-ranked tentative selectee.

47 C.F.R. § 1.823(a)-(b)(2) (1989).

In the present case, only one applicant, the tentative selectee, was chosen from each of the seven lotteries at issue; no alternates were chosen. None of the plaintiffs were tentative selectees. When the FCC announced the scheduling of the initial lotteries, the FCC issued lottery notices, which indicated that re-lotteries would be held if the tentative selectees were disqualified. The re-lotteries were to be held among the applications on file, excluding the dismissed appli-

cations. The notices read: "In the event that the application selected cannot be granted, another lottery will be held for that market and another application will be selected from the remaining applications." On April 8, 1992, the FCC held re-lotteries, including a re-lottery for one of the seven licenses at issue, the Tex. 21 license. *In re Cellular Rural Serv. Area Applications in Mkt. Nos. 599A and 672A,* DA 99–1426, 1999 WL 511242 (July 21, 1999). The tentative selectee in the Tex. 21 re-lottery was Alee Cellular Communications (Alee). Petitions to deny the license were filed against Alee's application. Therefore, Alee's application was considered "pending." Alee was subsequently disqualified as an applicant.[1]

On August 10, 1993, Congress enacted the Omnibus Budget Reconciliation Act of 1993, which added section 309(j) to the Communications Act of 1934. Pub.L. No. 103–66, Title VI, § 6002(a), 107 Stat. 312, 387–92 (1993) (codified at 47 U.S.C. § 309(j) (1994)). Section 309(j) gave the FCC express authority to employ competitive bidding procedures, or auctions, to choose among mutually exclusive applications for initial licenses. 47 U.S.C. § 309(j) (1994). On March 8, 1994, the FCC adopted rules implementing the auction provisions of the 1993 Budget Act. 47 C.F.R. §§ 1.2102 *et seq.* (1994); *see also In re Implementation of Section 309(j) of the Communications Act—Competitive Bidding,* 9 F.C.C.R. 2348, 1994 WL 412167 (1994).

Pertinent to the case before the court, section 6002(e) of the Omnibus Budget Reconciliation Act of 1993, titled "Special Rule," stated that: "[t]he Federal Communications Commission shall not issue any license or permit pursuant to section 309(i) of the Communications Act of 1934 (47 U.S.C. 309(i)) after the date of enactment of this Act unless ... one or more applications for such license were accepted for filing by the Commission before July 26, 1993." Pub.L. No. 103–66, Title VI, § 6002(e), 107 Stat. 312, 397 (1993) (codified at 47 U.S.C. § 309 note (1994)).

This special provision gave the FCC discretion to determine whether to employ auctions or lotteries for applications filed prior to July 26, 1993. Pursuant to this statutory provision, on May 27, 1994, the FCC decided to employ lotteries, in lieu of auctions, to resolve pending mutually exclusive applications for cellular unserved areas filed prior to July 26, 1993. *Implementation of Section 309(j) of the Communications Act–Competitive Bidding,* 59 Fed.Reg. 37,163 (July 21, 1994).

On August 2, 1994, the FCC revised its cellular licensing rules. *In re Revision of Part 22 of the Commission's Rules Governing the Public Mobile Services; Amendment of Part 22 of the Commission's Rules to Delete Section 22.119 and Permit the Concurrent Use of Transmitters in Common Carrier and Non-common Carrier Service; Amendment of Part 22 of the Commission's Rules Pertaining to Power Limits for Paging Stations Operating in the 931 MHz Band in the Public Land Mobile Service,* 9 F.C.C.R. 6513, 1994 WL 487328 (1994). The new 47 C.F.R. § 22.959 provided that:

> Pending applications for authority to operate the first cellular system on a channel block in an M.S.A. or RSA market continue to be processed under the rules governing the processing of such applications that were in effect when those applications were filed, unless the Commission determines otherwise in a particular case.

47 C.F.R. § 22.959 (1995). In the present case, the governing rule at the time the plaintiffs' applications were filed was the 1988 rule, 47 C.F.R. § 22.33, which provided for the use of lotteries to distribute cellular licenses.

On July 12, 1996, the FCC announced that it would hold re-lotteries on September 18, 1996 for the six remaining markets at issue. The FCC also stated that additional re-lotteries would be held if any of the applications selected on September 18, 1996 could not be granted licenses.

---

1. On November 1, 2002, an FCC Administrative Law Judge dismissed Alee's application for the Tex. 21 license. *In re Application of Alee Cellular Communications for Authorization to Construct Nonwireline Cellular Sys. in Texas RSA 21 Market 672A,* WT Docket No. 02–28, File No. 11025–CL– P–672–A–89 (Nov. 1, 2002). Alee did not file a notice of appeal. All parties in the present case acknowledge that if Alee's application had been granted, the plaintiffs' claim as to that license would be moot.

On September 9, 1996, Cellular Communications of Puerto Rico (CCPR) filed an *ex parte* petition requesting the FCC to issue a declaratory ruling that an auction, in lieu of a lottery, would be used to award the cellular license for the P.R. 5 market. *Cellular Communications of Puerto Rico, Inc. Petition for Declaratory Ruling, or, in the Alternative, for Rulemaking,* RM–8897 (filed Sept. 9, 1996). Alternatively, CCPR requested that the FCC initiate a rulemaking proceeding to determine whether an auction should be held, in lieu of a lottery, for this market.

On September 10, 1996, the Chief of the Commercial Wireless Division issued a public notice, stating that the re-lotteries for the six markets previously scheduled for September 18, 1996 were postponed. FCC Public Notice, *Wireless Telecommunications Bureau Postpones Cellular Telecommunications Service Lottery for Rural Service Areas,* Mimeo No. 65051, 1996 WL 511785 (Sept. 10, 1996). No explanation was given at that time. On October 24, 1996, the FCC stated that CCPR's petition "raises issues concerning the broader applicability of the use of competitive bidding to award cellular licenses for RSAs for which applications were filed prior to July 26, 1993, where the original tentative selectee has been disqualified and no license has been awarded to date." FCC Public Notice, *Public Comment Invited Cellular Communications of Puerto Rico, Inc. Petition for Declaratory Ruling or Rulemaking to Determine Whether Competitive Bidding Procedures Should be Used to License Certain Cellular Rural Service Areas,* RM–8897, 1996 WL 752915 (Oct. 24, 1996). The FCC decided to treat CCPR's petition as a petition for rulemaking and requested comments on awarding cellular licenses through competitive bidding for all remaining unlicensed RSAs. *Id.*

On August 5, 1997, Congress passed the Balanced Budget Act of 1997 (1997 Budget Act), which repealed Section 6002(e) of the 1993 Budget Act and terminated the FCC's authority to award licenses via lotteries, even in the case of applications filed prior to July 26, 1993, except for licenses for non-commercial educational and public broadcast stations. Pub.L. No. 105–33, § 3002(a)(4), § 3002(a)(2)(B), 111 Stat. 251, 258, 260 (1997) (codified at 47 U.S.C. § 309(i)(5) (2000)). Section 309(i)(5) states: "Except as provided in subparagraph (B), the Commission shall not issue any license or permit using a system of random selection under this subsection after July 1, 1997." Given the termination of the FCC's remaining lottery authority, on April 2, 1999, the Wireless Telecommunications Bureau (WTB) dismissed all pending cellular lottery applications in the following six RSAs: N.D 3; Minn. 11; Ark. 9; Fla. 11; P.R. 5; and Pa. 4. *In re Certain Cellular RSA Applications,* 14 F.C.C.R. 4619, 1999 WL 181812 (1999). In addition, the WTB determined that the plaintiffs were not entitled to a refund of their $200.00 filing fees because they had participated in the initial lotteries for those six RSAs. *Id.* Similarly, on April 29, 1999, the Cable Wireless Division, employing the same rationale, dismissed the plaintiffs' applications for Tex. 21 and denied a filing fee refund. *In re Certain Cellular RSA Applications in Market Nos. 599A and 672A,* DA 99–814 (Apr. 29, 1999).

On December 21, 2000, Congress passed the Launching Our Communities' Access to Local Television Act of 2000 (Local TV Act), Pub.L. No. 106–553, Title X, § 1007, 114 Stat. 2762A–128, 2762A–138 (2000), which mandated that the FCC reinstate the original tentative selectees for three of the seven RSAs at issue (Great Western for Minn. 11; Monroe Telephone Services L.P. (Monroe) (formerly Cellwave) for Fla. 11; and FutureWave for Pa. 4). The United States Court of Appeals for the District of Columbia Circuit had previously affirmed the FCC's decision to dismiss these three applications. *See Cellwave Tel. Servs. L.P. v. FCC,* 30 F.3d 1533 (D.C.Cir.1994); *Great Western Cellular Partners v. FCC,* 72 F.3d 919, 1995 WL 761842 (D.C.Cir.1995) (table). On March 16, 2001, in compliance with the Local TV Act, the FCC announced the granting of licenses to Monroe for Fla. 11; Great Western for Minn. 11; and FutureWave for Pa. 4. FCC Public Notice, *Wireless Telecommunications Bureau Grants Rural Cellular Licenses,* 16 F.C.C.R. 5601, 2001 WL 273976 (2001).

On January 13, 2001, the FCC proposed rules under which it would auction licenses in the following four RSA markets: Ark. 9; N.D. 3; Tex. 21; and P.R. 5. *In re Implementation of Competitive Bidding Rules to License Certain Rural Service Areas,* 16 F.C.C.R. 4296, 2001 WL 114343 (2001). On January 16, 2002, the FCC adopted rules to govern the conduct of auctions to award licenses in RSA markets in which no tentative selectee had been selected by a second lottery conducted prior to July 1, 1997, and in which Congress had not directed the FCC to reinstate an original tentative selectee. 47 C.F.R. §§ 22.228, 22.969 (2002); *see also In re Implementation of Competitive Bidding Rules to License Certain Rural Service Areas,* 17 F.C.C.R.1960, 2002 WL 100245 (2002). As a result, the Commission adopted auction rules for four of the seven RSA markets at issue in the present case: Tex. 21; N.D. 3; P.R. 5; and Ark. 9. 47 C.F.R. §§ 22.228, 22.969.

The plaintiffs in the present case have not sought reconsideration or review of the dismissal of their applications at the FCC. Plaintiffs filed a class action complaint in this court, and, subsequently, filed an amended class action complaint. Plaintiffs also filed a motion seeking to certify a purported class consisting of all applicants whose applications had been accepted for filing by the FCC for cellular licenses in the seven RSAs in 1988, excluding those applicants that became tentative selectees, but were disqualified by the FCC. The defendant filed a motion to dismiss. Defendant also filed a motion to stay consideration of plaintiffs' class certification request pending the court's resolution of its pending motion to dismiss, which the court granted.

## DISCUSSION

Subject matter jurisdiction may be challenged at any time by the parties, by the court sua sponte, even on appeal. *Fanning, Phillips, Molnar v. West,* 160 F.3d 717, 720 (Fed.Cir.1998) (quoting *Booth v. United States,* 990 F.2d 617, 620 (Fed.Cir.), *reh'g denied* (1993)); *United States v. Newport News Shipbuilding & Dry Dock Co.,* 933 F.2d 996, 998 n. 1 (Fed.Cir.1991). Once jur-

isdiction is challenged by the court or the opposing party, the plaintiff bears the burden of establishing jurisdiction. *See McNutt v. Gen. Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1377 (Fed.Cir.1998); *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1324 (Fed.Cir.1997); *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991); *Bowen v. United States,* 49 Fed.Cl. 673, 675 (2001) (noting that the plaintiff bears the burden of proof on a motion to dismiss for lack of jurisdiction), *aff'd,* 292 F.3d 1383 (Fed.Cir. 2002); *Schweiger Constr. Co. v. United States,* 49 Fed.Cl. 188, 205 (2001); *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. 399, 404 (1994). A plaintiff must establish jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988); *Martinez v. United States,* 48 Fed.Cl. 851, 857 (2001), *aff'd in part,* 281 F.3d 1376 (Fed.Cir.), *reh'g denied* (2002); *Bowen v. United States,* 49 Fed.Cl. at 675; *Vanalco, Inc. v. United States,* 48 Fed.Cl. 68, 73 (2000); *Alaska v. United States,* 32 Fed.Cl. 689, 695 (1995), *appeal dismissed,* 86 F.3d 1178, 1996 WL 285759 (Fed.Cir.1996) (table). When construing the pleadings pursuant to a motion to dismiss, the court should grant the motion only if "it appears beyond doubt that [plaintiff] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (quoting *Conley v. Gibson,* 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Leider v. United States,* 301 F.3d 1290, 1295 (Fed.Cir.), *reh'g and reh'g en banc denied* (2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 1786, 155 L.Ed.2d 666 (2003); *Conti v. United States,* 291 F.3d 1334, 1338 (Fed.Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 904, 154 L.Ed.2d 785 (2003); *Consolidated Edison Co. v. O'Leary,* 117 F.3d 538, 542 (Fed.Cir.1997), *cert. denied sub nom. Consolidated Edison Co. v. Pena,* 522 U.S. 1108, 118 S.Ct. 1036, 140 L.Ed.2d 103 (1998); *see also New Valley Corp. v. United States,* 119 F.3d 1576, 1579 (Fed.Cir.), *reh'g denied, en banc suggestion declined* (1997); *Highland Falls–Fort Montgomery Cent. School Dist. v. United States,*

48 F.3d 1166, 1169 (Fed.Cir.), *cert. denied,* 516 U.S. 820, 116 S.Ct. 80, 133 L.Ed.2d 38 (1995); *Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989); *W.R. Cooper Gen. Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed.Cir.1988) ("When the facts alleged in the complaint reveal 'any possible basis on which the non-movant might prevail,' the motion must be denied.' "); *RCS Enters., Inc. v. United States,* 46 Fed.Cl. 509, 513 (2000).

Pursuant to Rule 8(a)(1) of the Rules of the Court of Federal Claims (RCFC) and Rule 8(a)(1) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds upon which the court's jurisdiction depends." RCFC 8(a)(1). However, "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States,* 124 F.3d 1462, 1465 (Fed.Cir.), *reh'g denied* (1997) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)). "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *see also Bradley v. Chiron Corp.,* 136 F.3d 1317, 1322 (Fed.Cir.1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

When deciding on a motion to dismiss based on lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Conley v. Gibson,* 355 U.S. at 45–46, 78 S.Ct. 99; *Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1343 (Fed.Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 1484, 155 L.Ed.2d 226 (2003); *Pixton v. B & B Plastics, Inc.,* 291 F.3d 1324, 1326 (Fed.Cir. 2002); *Boyle v. United States,* 200 F.3d 1369, 1372 (Fed.Cir.2000); *Perez v. United States,* 156 F.3d 1366, 1370 (Fed.Cir.1998); *High-*

*land Falls–Fort Montgomery Cent. School Dist. v. United States,* 48 F.3d at 1167 (citing *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991)); *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995); *Hamlet v. United States,* 873 F.2d at 1416; *Ho v. United States,* 49 Fed.Cl. 96, 100 (2001), *aff'd,* 30 Fed.Appx. 964 (Fed.Cir. 2002); *Alaska v. United States,* 32 Fed.Cl. at 695. If a defendant or the court challenges jurisdiction or plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. at 189, 56 S.Ct. 780; *see also Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 747; *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. at 404–05. When considering a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to resolve any factual disputes. *See Moyer v. United States,* 190 F.3d 1314, 1318 (Fed.Cir.1999); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 747; *see also Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1584 (Fed.Cir. 1993) ("In establishing predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony."), *cert. denied,* 512 U.S. 1235, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994); *Vanalco v. United States,* 48 Fed.Cl. at 73 ("If the truth of the alleged jurisdictional facts is challenged in a motion to dismiss, the court may consider relevant evidence to resolve the factual dispute.").

In order for this court to have jurisdiction over a plaintiff's complaint, the Tucker Act requires that the plaintiff identify an independent substantive right enforceable against the United States for money damages. 28 U.S.C. § 1491 (2000). The Tucker Act states:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or

upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, this Act waives sovereign immunity to allow jurisdiction over claims (1) founded on an express or implied contract with the United States; (2) for a refund from a prior payment made to the government; or (3) based on federal constitutional, or statutory, or regulatory law mandating compensation by the federal government for damages sustained. *See United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114, *reh'g denied,* 425 U.S. 957, 96 S.Ct. 1736, 48 L.Ed.2d 202 (1976) (citing *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 605–06, 372 F.2d 1002, 1009 (1967)); *see also Palmer v. United States,* 168 F.3d 1310, 1314 (Fed.Cir.1999); *Stinson, Lyons & Bustamante, P.A. v. United States,* 33 Fed.Cl. 474, 478 (1995), *aff'd,* 79 F.3d 136 (Fed.Cir.1996). A waiver of traditional sovereign immunity cannot be implied but must be "unequivocally expressed." *INS v. St. Cyr,* 533 U.S. 289, 299 n. 10, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); *United States v. Nordic Village, Inc.,* 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Ins. Co. of the West v. United States,* 243 F.3d 1367, 1372 (Fed.Cir.), *reh'g and reh'g en banc denied* (2001); *Saraco v. United States,* 61 F.3d 863, 864 (Fed.Cir.1995) (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)), *cert. denied,* 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996).

The Tucker Act, however, merely confers jurisdiction on the United States Court of Federal Claims, " 'it does not create any substantive right enforceable against the United States for money damages.' " *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (quoting *United States v. Testan,* 424 U.S. at 398–99, 96 S.Ct. 948), *reh'g denied,* 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); *White Mountain Apache Tribe v. United States,* 249 F.3d 1364, 1372 (Fed.Cir.2001), *aff'd,* —— U.S. ——, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003); *Cyprus Amax Coal Co. v. United States,* 205 F.3d 1369, 1373 (Fed.Cir.2000), *cert. denied,* 532 U.S. 1065, 121 S.Ct. 2214, 150 L.Ed.2d

208 (2001); *New York Life Ins. Co. v. United States,* 118 F.3d 1553, 1555–56 (Fed.Cir. 1997), *cert. denied,* 523 U.S. 1094, 118 S.Ct. 1559, 140 L.Ed.2d 792 (1998); *United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir.1983) (en banc), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984). Individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Mitchell,* 445 U.S. at 538, 100 S.Ct. 1349. In order for a claim to be successful, the plaintiff "must also demonstrate that the source of law relied upon 'can fairly be interpreted as mandating compensation by the federal government for the damages sustained.' " *White Mountain Apache Tribe v. United States,* 249 F.3d at 1372 (quoting *United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)); *United States v. Testan,* 424 U.S. at 400, 96 S.Ct. 948; *Tippett v. United States,* 185 F.3d 1250, 1254 (Fed.Cir.1999) ("[T]he plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States.") (quoting *James v. Caldera,* 159 F.3d 573, 580 (Fed.Cir.1998), *reh'g denied* (1999)); *Doe v. United States,* 100 F.3d 1576, 1579 (Fed.Cir. 1996), *reh'g denied, en banc suggestion declined* (1997); *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. at 607, 372 F.2d at 1009.

In the present case, the plaintiffs claim that the government breached an implied-infact contract, formed when the plaintiffs filed lottery applications and submitted the requisite fees, by failing to hold re-lotteries to award the cellular licenses at issue. In addition, the plaintiffs assert that the FCC's decision to cancel the lotteries, and the revocation of the FCC's authority to award licenses via lotteries by Congress, violated the Takings Clause of the Fifth Amendment in that the government allegedly took the plaintiffs' contract rights without paying just compensation.

With respect to the Fla. 11; Minn. 11; and Pa. 4 RSA cellular markets, the plaintiffs also make two, additional takings arguments that relate to the Local TV Act of 2000. This

argument is based on decisions by the FCC, affirmed by the United States Court of Appeals for the District of Columbia. The Local TV Act of 2000 directed the FCC to reinstate three tentative selectees that had been disqualified by the FCC, with the disqualification having been upheld in the United States Court of Appeals for the District of Columbia. Therefore, the plaintiffs maintain that the Local TV Act of 2000 unconstitutionally appropriated, or was a taking of, their alleged contractual rights. The plaintiffs also argue that the Local TV Act of 2000 constitutes an uncompensated taking of the plaintiffs' contract rights regarding Fla. 11; Minn. 11; and Pa. 4 RSA cellular markets, in yet another manner. The Local TV Act of 2000 directed the FCC to charge the previously disqualified tentative selectees license fees, which the plaintiffs maintain were less than the fair market value of the licenses, thereby conferring a private benefit on those tentative selectees.

In response to plaintiffs' complaint, the defendant filed a motion to dismiss the complaint for lack of subject matter jurisdiction. According to the defendant, although the complaint nominally seeks money damages, it effectively requests the court to review the FCC's licensing orders, a matter that is exclusively assigned by statute to the United States Court of Appeals for the District of Columbia Circuit. Alternatively, the defendant requested that the complaint be dismissed for failure to state a claim upon which relief can be granted.

## I. Implied–in–Fact Contract Claim

Plaintiffs have alleged an implied-in-fact contract in the Court of Federal Claims under the Tucker Act. The Tucker Act of 1887 grants the Court of Federal Claims jurisdiction over, *inter alia*, "[a]ny claim against the United States founded ... upon any express or implied contract with the United States

.... " 28 U.S.C. § 1491(a)(1) (2000). In the 1952 Amendments to the Communications Act of 1934, Congress provided for, *inter alia*, the redress of denials of cellular license applications by the FCC. *See* Act of July 16, 1952, 66 Stat. 718 (codified at 47 U.S.C. § 402(b)(1)). Section 402(b)(1)[2] provides that: "Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases: (1) By any applicant for a construction permit or station license, whose application is denied by the Commission." Although plaintiffs characterize their case as a contract action, defendant argues that the plaintiffs are actually seeking review of the orders dismissing the plaintiffs' cellular applications by the Wireless Telecommunications Bureau, which should be contested pursuant to the provisions of 47 U.S.C. § 402(b). Therefore, the issue before the court regarding jurisdiction is whether plaintiffs must bring their case before the FCC and then the District of Columbia Circuit Court of Appeals, or may bring their causes of action to this court pursuant to the Tucker Act.

"It is, of course, a cardinal principle of statutory construction that repeals by implication are not favored." *Randall v. Loftsgaarden*, 478 U.S. 647, 661, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986) (citations omitted); *see also Inter–Coastal Xpress, Inc. v. United States*, 296 F.3d 1357, 1370 (Fed.Cir.2002); *State of California v. United States*, 271 F.3d 1377, 1382 (Fed.Cir.2001). Furthermore, "where two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (citations omitted). Repeals by implication are countenanced only when the two statutes are irreconcilable. *See Hanlin v. United*

2. Throughout the proceedings, defendant asserted jurisdiction in the United States Court of Appeals for the District of Columbia Circuit, pursuant to section 402(b) in general. During oral argument, however, defendant's counsel referred to section 402(b)(6), which is inapplicable to the plaintiffs before the court. It is section 402(b)(1) which refers to appeals from decisions and orders of the Commission by "any applicant" of license denials. Section 402(b)(6) refers to appeals from decisions and orders of the Commission by "any other person who is aggrieved or whose interests are adversely affected." *See also Waterway Communications Systems, Inc. v. FCC*, 851 F.2d 401 (1988).

*States*, 214 F.3d 1319, 1321 (Fed.Cir.), *reh'g denied* (2000) (citing *Morton v. Mancari*, 417 U.S. 535, 550, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)). Under this stringent test, it can be argued that the 1952 Amendments to the Communications Act of 1934 did not impliedly repeal the Tucker Act of 1887. Clearly, the plaintiffs, in their search for a remedy, could have proceeded down the road Congress paved for them in 47 U.S.C. § 402(b), a road which leads to the District of Columbia Circuit Court of Appeals. In addition, this court would not be divested of jurisdiction under the Tucker Act, so long as the plaintiffs' alleged implied-in-fact contract claims are non-frivolous. *See Hanlin v. United States*, 214 F.3d at 1321–22.

Assuming, for the sake of argument, that this court has jurisdiction to entertain plaintiffs' implied-in-fact contracts, and because certain case precedent suggests that almost any implied-in-fact allegation gives this court jurisdiction to review such claims, the court will review plaintiffs' claim in this regard. As discussed below, however, the court believes that, logically, plaintiffs' complaint, based on FCC decisions to dismiss plaintiffs' applications, should be reviewed in the United States Court of Appeals for the District of Columbia and not in this court.

■ An implied-in-fact contract is an agreement " 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances their tacit understanding.' " *Trauma Serv., Group v. United States*, 104 F.3d at 1326 (quoting *Hercules, Inc. v. United States*, 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996)) (quoting *Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923)); *see also Bay View, Inc. v. United States*, 278 F.3d 1259, 1265–66 (Fed.Cir.2001) (citing *Trauma Service Group v. United States*, 104 F.3d at 1326), *reh'g and reh'g en banc denied*, 285 F.3d 1035 (Fed.Cir.), *cert. denied*, 537 U.S. 826, 123 S.Ct. 114, 154 L.Ed.2d 37 (2002). The Federal Circuit, in the *Barrett Refining* case, restated the elements of an implied-in-fact contract as mutuality of intent to con-

tract; consideration; lack of ambiguity in offer and acceptance; and authority to bind the government. *Barrett Refining Corp. v. United States*, 242 F.3d 1055, 1060 (Fed.Cir.), *reh'g denied* (2001). "In short, an implied-in-fact contract arises when an express offer and acceptance are missing but the parties' conduct indicates mutual assent." *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed.Cir.1998) (citing *Chavez v. United States*, 18 Cl.Ct. 540, 544 (1989)).

■ In the present case, the plaintiffs allege that they entered into an implied-in-fact contract with the FCC, such that the FCC was contractually bound to hold re-lotteries for cellular licenses. More specifically, plaintiffs state that:

[T]he FCC made a public offer that applicants would have chances of winning RSA licenses in lotteries. Acceptance of that offer was conditioned on the applicants properly filing applications and paying $200 in fees to the FCC in accordance with its lottery rules and procedures. Under contract law, by filing applications and paying the fees as the FCC required in 1988, plaintiffs accepted the FCC's offer, agreed to the FCC's lottery rules and procedures, and formed binding contracts with the FCC. Plaintiffs provided consideration by entering the lotteries and complying with the FCC's lottery rules and procedures.

The terms of the contracts between the FCC and plaintiffs were set out in the FCC's lottery rules and the procedures announced to the public in its lottery notices. One of the terms of the contracts was set prior to the first "non-wireline" lottery, when the FCC's Common Carrier Bureau ("CCB") issued a "lottery notice" that included the statement: "In the event that the application selected cannot be granted, another lottery will be held for that market and another application will be selected from the remaining applications." An identical statement was included in each of the seven lottery notices the CCB issued before the lotteries for the Seven Licenses. The public announcement that re-lotteries would be held contractually bound the FCC, as the lottery-promoter,

to hold re-lotteries that would include plaintiffs if the applications originally selected for the Seven Licenses could not be granted.

Under the common law of lotteries, the facts plaintiffs allege complete the normal offer-acceptance-consideration equation for the formation of enforceable contracts. Because the FCC never conducted the promised re-lotteries to award the Seven Licenses, plaintiffs state a cause of action for breach of implied lottery contracts.

The first element of an implied-in-fact contract is mutuality of intent to contract. The United States Supreme Court in *Baltimore & Ohio Railroad v. United States* stated that "an agreement will not be implied unless the meeting of minds was indicated by some intelligible conduct, act or sign." *Baltimore & Ohio R.R. v. United States,* 261 U.S. at 598, 43 S.Ct. 425; *see also Russell v. United States,* 182 U.S. 516, 530, 21 S.Ct. 899, 45 L.Ed. 1210 (1901) ("[T]o give the Court of Claims jurisdiction the demand sued on must be founded on a convention between the parties—'a coming together of minds.'") (quoted in *Hercules, Inc. v. United States,* 516 U.S. at 424, 116 S.Ct. 981); *Barrett Refining Corp. v. United States,* 242 F.3d at 1059–60; *Atlas Corp. v. United States,* 895 F.2d 745, 754 (Fed.Cir.), *cert. denied,* 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990).

The defendant contends that this first element of an implied-in-fact contract cannot be established in the case before this court. More specifically, defendant contends that "[p]laintiffs neither allege nor establish that the parties mutually intended to enter into binding unconditional contracts to use a random selection process to award licenses in the seven RSA markets at issue." According to the defendant, "[t]he FCC's simple receipt of plaintiffs' license applications did not create contracts." Moreover, the lottery notices and the FCC regulations, upon which the plaintiffs base their contract claim, do not indicate an intent upon the part of the FCC to be contractually bound to hold re-lotteries to distribute the cellular licenses at issue. Furthermore, since the FCC's rules can be modified pursuant to proper rulemaking proceedings, or by actions of Congress, the FCC could not have intended to enter into a contract with the plaintiffs to hold re-lotteries, regardless of changes in the rules and the law.

The plaintiffs allege that: "The FCC's promissory words were published in §§ 1.823 and 22.33 of its rules and in a series of lottery notices issued between August 18, 1988 and July 12, 1996." The plaintiffs maintain that it is through these rules and notices that the FCC became contractually bound to hold re-lotteries for the licenses at issue.

The two rules to which the plaintiffs point do not specifically mention the use of relotteries, but do indicate that lotteries were to be employed to select holders of cellular licenses. The rule at 47 C.F.R. § 1.823(a) (1989) stated that: "If there are mutually exclusive applications for an initial license, the Commission may use a random selection process....The designated Lottery Official shall select the winning applicant from among mutually exclusive applicants. The Lottery Official may select in rank order a number of additional applicants." 47 C.F.R. § 1.823(a) (1989). The rule at 47 C.F.R. § 22.33(a) reads in pertinent part: "If a properly filed application for an initial license ... is mutually exclusive with another such application, the applicants shall be included in the random selection process...." 47 C.F.R. § 22.33(a) (1988). The notices referred to by plaintiffs stated that "[i]n the event that the application selected cannot be granted, another lottery will be held for that market and another application will be selected from the remaining applications."

Although 47 C.F.R. §§ 1.823 and 22.33(a) and the notices provide for lotteries, none of these writings can be characterized as contractual promises by the FCC to be bound to hold lotteries or re-lotteries. Agency rules are subject to change in accordance with recognized procedures and especially when so mandated by changes in the statute. Nor do sections 1.823 and 22.33 of the regulations or the notices state that the FCC is prohibited from changing its rules in the future in accordance with properly recognized agency procedures or that the FCC warrants that re-lotteries would be held within a definite time period. Thus, no contractual promise to

hold re-lotteries within a definite time, in this case before the statutory change occurred, can be gleaned from the lottery notices or from FCC regulations.

In addition, the lottery notices and rules 47 C.F.R. §§ 1.823 and 22.33(a) cannot be read in isolation. On August 2, 1994, before the re-lotteries were scheduled to take place, the FCC revised Part 22 of its rules, which went into effect January 1, 1995. In the 1995 revision, section 22.33 was no longer included. Section 22.959 was added and stated in pertinent part:

> Pending applications for authority to operate the first cellular system on a channel block in an M.S.A. § or RSA market continue to be processed under the rules governing the processing of such applications that were in effect when those applications were filed, *unless the Commission determines otherwise in a particular case.*

47 C.F.R. § 22.959 (1995) (emphasis added).

When the lottery notices were issued, which indicated that if an application could not be selected, another lottery would be held, plaintiffs' applications would have been processed under section 22.33(a), which, at that time, provided for the FCC to award cellular licenses by lottery. Section 22.959, however, provided that cellular licenses be awarded by lottery, "unless the Commission determines otherwise in a particular case." 47 C.F.R. § 22.959. This qualifying language of section 22.959 does not manifest a clear intent to be bound to selection by lottery, because it indicates that the FCC, at its discretion, could decide not to follow the dictates of section 22.33(a). In other words, pursuant to its own rules, in effect in 1995, the FCC could exercise the discretion not to process pending applications for the RSA markets at issue by lottery. As a result, the lottery notices, which were not regulatory in nature, could be overridden by a subsequent FCC decision to handle particular license applications differently. Neither the regulations cited, nor the lottery notices, state a binding commitment to proceed by re-lottery and, therefore, do not indicate the mutuality of intent to contract, nor the definiteness of terms, required to establish an implied-in-fact contract.

It is well-established that an agency, such as the FCC, is permitted to modify its rules pursuant to rulemaking proceedings, and must follow the dictates of Congress. In this regard, the United States Court of Appeals for the District of Columbia Circuit found that the FCC possesses regulatory discretion to change license allocation procedures by "mak[ing] midstream rule adjustments, even though it disrupts expectations and alters the competitive balance among applicants." *Bachow Communications, Inc. v. FCC,* 237 F.3d 683, 687–88 (D.C.Cir.), *reh'g and reh'g en banc denied* (2001); *see also PLMRS Narrowband Corp. v. FCC,* 182 F.3d 995, 1000–01 (D.C.Cir.1999) (finding that an applicant who filed an application under lottery rules, in effect at the time the application was filed, did not thereby obtain a right to processing by lottery under those same rules. "We see nothing arbitrary or capricious in the Commission's decision to defer issuing licenses until it has finally settled upon the rules for doing so.... [B]ecause [plaintiff] obtained no such right [to have an application considered on the rules in effect at the time of filing], the Commission's subsequent charge in the regulations was not retroactive, let alone impermissibly retroactive, rulemaking."); *Chadmoore Communications, Inc. v. FCC,* 113 F.3d 235, 241 (D.C.Cir.1997) (The Commission's action did not "impair[ ] a right possessed by [plaintiff] because none vested on the filing of its application."), *reh'g denied* (1997); *DIRECTV, Inc. v. FCC,* 110 F.3d 816, 826 (D.C.Cir.1997) ("A rule that upsets expectations, as we held in *Bell Atlantic Tel. Cos. v. FCC,* 316 U.S.App. D.C. 395, 79 F.3d 1195, 1207 (D.C.Cir.1996), may be sustained 'if it is reasonable,' i.e., if it is not 'arbitrary' or 'capricious.' A change in policy is not arbitrary or capricious merely because it alters the current state of affairs. The Commission 'is entitled to reconsider and revise its views as to the public interest and the means needed to protect that interest,' if it gives a reasoned explanation for the revision.") (citation omitted); *Bechtel v. FCC,* 957 F.2d 873, 881 (D.C.Cir.1992) ("In the rulemaking context, for example, it is settled law that an agency may be forced to reexamine its approach 'if a significant factual predicate

of a prior decision ... has been removed.'... The Commission's necessarily wide latitude to make policy based upon predictive judgments deriving from its general expertise implies a correlative duty to evaluate its polices over time to ascertain whether they work—that is, whether they actually produce the benefits the commission originally predicted they would.") (citations omitted); *Maxcell Telecom Plus, Inc. v. FCC,* 815 F.2d 1551, 1555 (D.C.Cir.1987) (rejecting the argument that an applicant possessed any right to a specific procedure for awarding a license); *see also FCC v. WNCN Listeners Guild,* 450 U.S. 582, 603, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1981) ("[T]he Commission should be alert to the consequences of its policies and should stand ready to alter its rule if necessary to serve the public interest more fully."); *Implementation of Competitive Bidding Rules to License Certain RSAs,* 17 F.C.C.R.1960, 1971, 2002 WL 100245 (2002) ("[R]egardless of when an application is filed, an applicant has no vested right to a continuation of the licensing procedures in effect at the time its application was filed.").

Thus, the FCC not only can, but should modify its rules and regulations when doing so will advance the public interest, even if such a change alters the plans and goals of applicants. When the plaintiffs' license applications were filed, the FCC did not warrant that its rules, procedures or statutory authority would remain unchanged while plaintiffs' applications were pending. Therefore, the FCC could not have intended to be contractually bound to a particular set of procedures. For this reason, the FCC could not have intended to enter into a contract with the plaintiffs in which it was bound to hold re-lotteries.

In *Celtronix Telemetry, Inc. v. FCC,* the District of Columbia Circuit Court distinguished changes in the FCC's rules with the breach of contract claims cited in *United States v. Winstar Corp.*:

> Celtronix also urges a somewhat makeshift argument that the FCC's rule change was a breach of contract citing *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). But there the government had contractually bound

itself to bear the risk of specified regulatory change adverse to certain firms that had acquired failed saving and loan associations in reliance on that promise. Here, far from there being any such promise, there was, as we've noted, a long tradition of Commission authority to change rules governing already-issued licenses....

*Celtronix Telemetry, Inc. v. FCC,* 272 F.3d 585, 590 (D.C.Cir.2001) (citation omitted), *cert. denied,* 536 U.S. 923, 122 S.Ct. 2589, 153 L.Ed.2d 778 (2002).

As in *Celtronix Telemetry, Inc. v. FCC,* the FCC in the present case, had not "contractually bound itself to bear the risk of specified regulatory change...." *Id.* By contrast, it is the plaintiffs who assumed the risk of a change in the FCC's rules. The long tradition of Commission authority to change rules effectively precluded the FCC from making a contractual promise to the plaintiffs. In order to establish an implied-in-fact contract, all the constituent elements of such a contract must be demonstrated. Since the plaintiffs have failed to establish the first element of an implied-in-fact contract, mutuality of intent, the plaintiffs have failed to establish that an implied-in-fact contract existed between the plaintiffs and the FCC. Therefore, the court need not address the remaining elements of an implied-in-fact contract. Absent mutuality of intent, plaintiffs' claim that an implied-in-fact contract came into existence must fail.

## II. Jurisdiction to Review FCC Licensing Decisions

The defendant argues that, although the complaint nominally seeks money damages, the complaint actually requests and is "inextricably intertwined with" review of licensing orders issued by the FCC, a task that is exclusively within the province of the FCC and the United States Court of Appeals for the District of Columbia Circuit. According to the defendant, the complaint in this case is based upon two licensing decisions by the Wireless Telecommunications Bureau of the FCC, specifically the Bureau's April 2, 1999 order dismissing the plaintiffs' applications for six of the RSAs, and the Bureau's April

29, 1999 order dismissing the plaintiffs' application for the Tex. 21 market.

The general statute governing judicial review of FCC decisions is 47 U.S.C. § 402 (2000). *See Cook, Inc. v. United States*, 394 F.2d 84, 85 (7th Cir.1968). Under section 402(b), review of designated FCC decisions, including licensing decisions, falls within the exclusive jurisdiction of the District of Columbia Circuit Court of Appeals. 47 U.S.C. § 402(b). Section 402(b) states that: "Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia" in nine classes of cases involving the Commission's exercise of its radio licensing power.[3] *Id.; see NextWave Personal Communications, Inc. v. FCC*, 254 F.3d 130, 140 (D.C.Cir.2001), *aff'd*, 537 U.S. 293, 123 S.Ct. 832, 838, 154 L.Ed.2d 863 (2003) (example of an appeal to the District of Columbia Circuit Court pursuant to section 402(b) of the FCC's revocation of cellular licenses in which the court stated: " '[J]udicial review of all cases involving the exercise of the Commission's radio-licensing power is limited to [the United States Court of Appeals for the District of Columbia Circuit].' ") (quoting S.Rep. No. 82–44, at 11 (1951) (alteration in original); *In re Federal Communications Commission*, 217 F.3d 125, 140–41 (2000)); *Waterway Communications Sys., Inc. v. FCC*,

851 F.2d 401, 403 (D.C.Cir.1988) ("Jurisdiction for review of FCC licensing-related decisions is governed by § 402(b).").

Section 402(b)(1) provides for an appeal to the District of Columbia Circuit Court by "any applicant for a construction permit or station license, whose application is denied by the Commission." 47 U.S.C. § 402(b)(1). In *NextWave Personal Communications, Inc. v. FCC*, 254 F.3d at 140, the District of Columbia Circuit Court found that "[i]n *Mobile Communications Corp. of Am. v. FCC*, [77 F.3d 1399, 1403 (D.C.Cir.), *cert. denied*, 519 U.S. 823, 117 S.Ct. 81, 136 L.Ed.2d 38 (1996)] the term 'station license' in section 402(b) encompasses PCS [personal communications service] licenses." PCS licenses, in turn, include licenses for cellular telephone service.[4] Therefore, 47 U.S.C. § 402(b)(1) provides for an appeal to the District of Columbia Circuit Court by any applicant for a cellular license, whose application is denied by the Commission. In the present case, the WTB issued orders dismissing the cellular license applications at issue. *In re Certain Cellular RSA Applications*, 14 F.C.C.R. 4619, 1999 WL 181812 (1999); *In re Certain Cellular RSA Applications in Market Nos. 599A and 672A*, DA 99–814 (Apr. 29, 1999).

In addition, as the defendant underscores, case precedent indicates that section 402(b) applies to licensing decisions and to such

---

**3.** Section 402(b) reads in full:

Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases:

(1) By any applicant for a construction permit or station license, whose application is denied by the Commission.

(2) By any applicant for the renewal or modification of any such instrument of authorization whose application is denied by the Commission.

(3) By any party to an application for authority to transfer, assign, or dispose of any such instrument of authorization, or any rights thereunder, whose application is denied by the Commission.

(4) By any applicant for the permit required by section 325 of this title whose application has been denied by the Commission, or by any permittee under said section whose permit has been revoked by the Commission.

(5) By the holder of any construction permit or station license which has been modified or revoked by the Commission.

(6) By any other person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application described in paragraphs (1), (2), (3), (4), and (9) of this subsection.

(7) By any person upon whom an order to cease and desist has been served under section 312 of this title.

(8) By any radio operator whose license has been suspended by the Commission.

(9) By any applicant for authority to provide interLATA services under section 271 of this title whose application is denied by the Commission.

47 U.S.C. § 402(b).

**4.** "PCS is a family of mobile or portable radio communications services 'that free individuals from the constraints of the telephone wire and allow them to send and receive communications while away from their homes or offices.' " *Freeman Eng'g Assocs., Inc. v. FCC*, 103 F.3d 169, 175 (D.C.Cir.1997) (quoting *Adams Telcom, Inc. v. FCC*, 38 F.3d 576, 579 (D.C.Cir.1994)).

decisions that are "ancillary" to the licensing decisions expressly enumerated in section 402(b). For example, in *Cook v. United States,* the petitioner, Cook, sought to review and set aside an FCC order returning Cook's application for a radio broadcasting station license and an order denying Cook's petition for Commission reconsideration of the order returning the application. *Cook, Inc. v. United States,* 394 F.2d 84, 84–85 (7th Cir. 1968). The United States Court of Appeals for the Seventh Circuit noted that neither type of order is identified in the categories listed in section 402(b). *Id.* at 86. However, the Seventh Circuit found that the District of Columbia Circuit Court possessed exclusive jurisdiction to review the FCC orders under section 402(b) because the orders were " 'ancillary' to an exercise of the Commission's 'licensing power,' since Cook's application was returned because it was filed after a cutoff date which was set by the Commission in order that the Commission be enabled to exercise its licensing power efficiently and expeditiously." *Id.* at 87. Similarly, in *Kessler v. FCC,* the District of Columbia Circuit Court found that it possessed exclusive jurisdiction under section 402(b) to review an FCC order refusing to accept the appellants' license applications, pending the adoption of new rules. *Kessler v. FCC,* 326 F.2d 673, 679 n. 4 (D.C.Cir.1963); *see also Tomah–Mauston Broadcasting Co. v. FCC,* 306 F.2d 811, 811–812 (D.C.Cir.1962) (holding that the District of Columbia Circuit Court had sole jurisdiction under section 402(b) to review an FCC order denying a petition to stay and revoke a construction permit for a new broadcasting station because the order was considered "ancillary" to the grant of the construction permit.); *Metro. Television Co. v. United States,* 221 F.2d 879, 880 (D.C.Cir. 1955) (treating orders denying protests and orders denying rehearing as reviewable by the District of Columbia Circuit Court under section 402(b), although neither is specified in the nine subsections under section 402(b)); *Helena TV, Inc. v. FCC,* 269 F.2d 30, 30 (9th Cir.1959) (declining jurisdiction over a petition to review an FCC order which was considered "ancillary to a protest proceeding" pending before the FCC, on the ground

that sole jurisdiction was in the District of Columbia Circuit Court).

The plaintiffs argue that this case does not fall under section 402(b) because the WTB orders dismissing the applications were not final. The judicial review statute, 47 U.S.C. § 155(c)(7), states that: "[t]he filing of an application for review under this subsection shall be a condition precedent to judicial review of any order, decision, report, or action made or taken pursuant to a delegation under paragraph (1) of this subsection." 47 U.S.C. § 155(c)(7) (2000). In *Richman Brothers Records v. FCC,* the District of Columbia Circuit Court stated that filing of an application for review by the Commission is a condition precedent to judicial review of a decision taken pursuant to delegated authority. *Richman Bros. Records, Inc. v. FCC,* 124 F.3d 1302, 1303 (D.C.Cir.1997).

In this case, the orders dismissing the plaintiffs' applications were issued by the WTB, not by the full Commission. The plaintiffs did not appeal these orders internally within the FCC. The dismissal orders are not final decisions by the FCC and the District of Columbia Circuit cannot, now, hear this case under section 402(b). In their submissions to this court, the plaintiffs and the defendant concur that the WTB's staff orders were not final FCC orders which would have been immediately reviewable by the United States Court of Appeals for the District of Columbia Circuit pursuant to section 402(b).

While the plaintiffs are correct that the District of Columbia Circuit Court cannot, under the circumstances of this case, take jurisdiction, the fact that this case is not ripe for review in the District of Columbia Circuit does not speak to whether or not this court has jurisdiction over plaintiffs' claims. Had the plaintiffs exhausted their administrative remedies, an appeal of the FCC decision would have been proper in the District of Columbia Circuit Court, the court with statutory authority to review FCC licensing decisions. As discussed above, however, the plaintiffs argue that the District of Columbia Circuit Court lacks jurisdiction over this case because plaintiffs are requesting money damages for the government's alleged breach of

an alleged implied-in-fact contract and, therefore, that the Court of Federal Claims has jurisdiction.[5]

The general rule is that "[w]hen challenged jurisdictional facts are so closely tied to the merits of a claim that a dismissal for lack of subject matter jurisdiction is essentially a dismissal on the merits, the court should generally assume jurisdiction and decide the case on its merits." *Lewis v. United States*, 32 Fed.Cl. 301, 305 (1994), *aff'd*, 70 F.3d 597 (Fed.Cir.1995). The Federal Circuit concluded in *Lewis* that:

> Under this general rule, a complaint alleging that the plaintiff has a right to relief on a ground as to which the court has jurisdiction raises a question within the court's subject matter jurisdiction as long as the asserted basis of jurisdiction is not pretextual, i.e., as long as the jurisdictional ground asserted in the complaint does not "appear [ ] to be immaterial and made solely for the purpose of obtaining jurisdiction." *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716 (1913) (no jurisdiction if "plaintiff was not really relying upon the patent law for his alleged rights"); *Excelsior Wooden Pipe Co. v. Pacific Bridge Co.*, 185 U.S. 282, 287, 22 S.Ct. 681, 46 L.Ed. 910 (1902) (no jurisdiction if jurisdictional allegations "were immaterial and made for the purpose of creating a case cognizable by the court").

*Lewis v. United States*, 70 F.3d at 603 (alteration in original). The Federal Circuit in *Lewis* wrote further:

> To be sure, the Supreme Court has stated that there may be instances in which a claim that is otherwise within the court's jurisdiction is so insubstantial on its merits that a dismissal may termed jurisdictional. In this century, however, the Court's references to that exception to the general rule have often been unenthusiastic, and it may be that the exception is best viewed as a vestige of nineteenth-century practice that has no continuing vitality in the age of modern pleading. *See Montana–Dakota Utilities Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. [246] at 249 [71 S.Ct. 692, 95 L.Ed. 912 (1951)] ("Even a patently frivolous complaint might be sufficient to confer power to make a final decision that is [on the merits], binding as *res judicata* on the parties."); *Bell v. Hood*, 327 U.S. at 683 [, 66 S.Ct. 773] ("The accuracy of calling these dismissals jurisdictional has been questioned."); *see also Yazoo County Indus. Dev. Corp. v. Suthoff*, 454 U.S. 1157, 1160, 102 S.Ct. 1032, 71 L.Ed.2d 316 (1982) (Rehnquist, J., dissenting from denial of *certiorari*) (jurisdictional dismissal for "insubstantiality" are "wholly at odds with Rule 12(b) of the Federal Rules of Civil Procedure"). The "frivolousness" exception has no apparent grounding in the Federal Rules of Civil Procedure, or the parallel Rules of the United States Court

5. In a Memorandum Opinion and Order issued on April 29, 2002 dismissing a claim filed by Hightower Communications, the FCC wrote:

First, we find that the Commission lacks jurisdiction to entertain Hightower's claim for money damages. Indeed, Hightower concedes that "the issues [presented in its Application for Review] are within the exclusive jurisdiction of the United States Court of Federal Claims," and fails to cite any precedent supporting Commission jurisdiction, but merely states that it is raising these claims before the Commission out of an abundance of caution. We agree with Hightower's conclusion that the Commission does not have jurisdiction over claims for money damages, and are unaware of any case, statute, or rule authorizing the Commission to award money damages. This alone provides sufficient basis for dismissal of Hightower's claim.

*In re Certain Cellular Rural Service Area Applications*, Nos. 9179072, *et al.*, F.C.C. 02–129, slip op. at 8, 2002 WL 925319 (2002) (footnotes omitted). Without taking a position on the merits of this court's jurisdiction, footnote 47 at the end of the above selected portion of the FCC Opinion and Order states: "To the extent that plaintiffs in the *Folden* case are taking issue with the regulatory decisions of the Commission, their arguments belong before the Commission and the federal courts of appeals." *Id.* at slip op. 8 n. 47.

As discussed above, in the section of this opinion on plaintiffs' implied-in-fact contract claim, this court finds that plaintiffs' implied-in-in fact contract claim is without merit. The FCC never entered into any form of contract with plaintiffs to hold re-lotteries or into a guarantee that plaintiffs would be issued licenses following submission of their applications. Moreover, this court believes that it was the congressional intent to have FCC licensing orders reviewed by the United States Court of Appeals for the District of Columbia Circuit.

of Federal Claims. Moreover, in light of the rule that a jurisdictional dismissal is not *res judicata* as to the underlying merits of the dispute, *see Do–Well Machine Shop, Inc. v. United States,* 870 F.2d 637, 640 (Fed.Cir.1989), the "frivolousness" exception gives rise to the anomaly that if frivolous claims are dismissed for want of jurisdiction, rather than on the merits, the principle of *res judicata* will be least applicable to the most insubstantial claims.

Because the Supreme Court has not overturned the line of cases countenancing the dismissal of frivolous claims on jurisdictional grounds, we are not free to disregard that doctrine. Nonetheless, the Supreme Court has made clear that such jurisdictional dismissals for frivolousness must be "confined" to cases "that are very plain." *Hart v. B.F. Keith Vaudeville Exch.,* 262 U.S. [271] at 274, [43 S.Ct. 540, 67 L.Ed. 977 (1923)] *see also Hagans v. Lavine,* 415 U.S. 528, 542–43, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

*Lewis v. United States,* 70 F.3d at 603–04; *see also Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946) ("[A] suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is insubstantial and frivolous."); *City of Cincinnati v. United States,* 153 F.3d at 1377 ("[T]he invocation of the implied contract theory is sufficient ... to set forth a basis for subject-matter jurisdiction, because the [plaintiff] has made a non-frivolous assertion of an implied contract with the United States."); *William M. Hanlin v. United States,* 214 F.3d 1319, 1321 (Fed.Cir.2000); *Trauma Serv. Group v. United States,* 104 F.3d at 1325; *Spruill v. Merit Sys. Protection Bd.,* 978 F.2d at 687–88.

Plaintiffs ignored the prescribed channels within the FCC and before the District of Columbia Circuit Court for redress of their unapproved applications, and, instead, conjured a contract theory from the mere chance to obtain a cellular license following submission of their applications. Plaintiffs use the pretext of a contract review to seek redress from applicable FCC statutes and regulations. There were no contract negotiations and there were no contract documents, so plaintiffs' attempt to resort to a contract theory is, of necessity, based on alleged implied contracts. Courts should not give credence to plaintiffs' attempts to circumvent established agency and federal court procedures, particularly since not only was no contract formed, but no contract was ever contemplated. Plaintiffs can offer the court no precedent to support their novel attempt to imply a contract under the facts presented.

This court has found above that on the merits no implied-in-fact contract between the defendant and the plaintiffs came into existence. Recognizing the rare instances in which the appellate courts have been willing to invoke the "frivolousness" exception, *see Lewis v. United States,* 70 F.3d at 603–04, this court nonetheless believes that the instant case may provide one of those rare examples. If, as normally would be the case for claims like the ones brought by the plaintiffs, no implied-in-fact contracts would come into existence between a license applicant and the FCC, it would be senseless to force this or any other court to repeatedly address the jurisdictional arguments and/or contract allegations. As discussed above, the intent of Congress to have FCC licensing application decisions reviewed by the Court of Appeals for the District of Columbia seems clear. For plaintiffs to use valuable court time by renaming their claim and thereby seeking redress in a different court, or because they failed to pursue their administrative remedies to seek another forum for redress, is not an efficient use of the judicial resources at the trial or appellate level. To acknowledge the possibility of the existence of a contract under these circumstances for the purposes of jurisdiction, only to, ultimately, find no contract in existence, is to undermine statutory and regulatory procedures carefully designed to address grievances associated with FCC licensing applications. This court believes that plaintiffs' implied-in-fact contract claims represent one of those "instances in which a claim that is otherwise within the court's jurisdiction is so insubstantial on its merits that a dismissal may be

termed jurisdictional." *Lewis v. United States,* 70 F.3d at 603.

## III. Takings Claim

■ Plaintiffs' takings claims are based on the theory that the government took contract rights of the plaintiffs without paying just compensation pursuant to the Fifth Amendment to the Constitution. The plaintiffs allege that the FCC's decision to cancel the lotteries, in anticipation of revocation of the FCC's lottery authority by Congress, violated the Takings Clause of the Fifth Amendment.

The plaintiffs also argue that Congress, by the enactment of section 1007 of the Local TV Act of 2000, appropriated plaintiffs' contract rights. This argument refers to the three tentative selectees from the initial lotteries for three RSAs, none of which are plaintiffs in the present action: Great Western Cellular Partners (Great Western), selected in the initial lottery for the Minn. 11 license; Cellwave Telephone Services L.P. (Cellwave), selected in the initial lottery for the Fla. 11 license; and FutureWave General Partners L.P. (FutureWave), selected in the initial lottery for the Pa. 4 license. In each case, the FCC dismissed the tentative selectees' applications pursuant to prohibitions in FCC regulations that were in effect at the time. The District of Columbia Circuit Court affirmed the FCC orders, approving of the dismissal of the applications as lawful exercises of the FCC's authority. *See Cellwave Telephone Services L.P. v. FCC,* 30 F.3d 1533, 1538 (D.C.Cir.1994); *Great Western Cellular Partners v. FCC,* 72 F.3d at 919, 1995 WL 761842. Subsequently, the Local TV Act of 2000 was enacted, directing the FCC to reinstate the three applications initially selected in the lotteries for those three RSAs, and to award the licenses to those applicants, if their applications otherwise met the FCC's requirements. *See* Pub.L. No. 106–553, Title X, § 1007, 114 Stat. 2762.[6]

In addition, plaintiffs assert that the Local TV Act of 2000 constitutes an uncompensated taking of the plaintiffs' contract rights because the Local TV Act of 2000 directed the FCC to charge the previously disqualified tentative selectees license fees, which the plaintiffs maintain were less than fair market value license fees. The plaintiffs argue that the statute, therefore, conferred a private benefit on those tentative selectees. According to the plaintiffs, the Local TV Act of 2000 constitutes an uncompensated taking of plaintiffs' contract rights in that the contract rights were not taken "for public use," as mandated by the Fifth Amendment, but for the private use of those awarded cellular licenses.

The Fifth Amendment to the United States Constitution provides: "nor shall private property be taken for public use, without just compensation." U.S. Const. Amend. V. In order to succeed "[a]s part of a takings case, the plaintiff must show a legally-cognizable property interest." *Sante Fe Pacific R.R. Co. v. United States,* 294 F.3d 1336, 1344 (Fed.Cir.2002); *Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1580 (Fed. Cir.), *reh'g denied* (1993) ("Not all losses generate a Fifth Amendment taking.") (citing *United States ex rel. Tennessee Valley Auth. v. Powelson,* 319 U.S. 266, 281, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943)). The plaintiffs allege that the property rights taken by the government in the case at bar are their contract rights to have chances of winning or participating in re-lotteries for the cellular licenses at issue. As discussed above, however, the court has found that no express or implied-in-fact contract arose between the plaintiffs and the FCC. Therefore, having failed to establish the existence of a legally cognizable contract right or property interest, plaintiffs cannot successfully present a proper takings

6. Plaintiffs also argue that the enactment of the Local TV Act of 2000, which directed the FCC to reinstate the three original selectees for cellular markets, was a violation of the doctrine of "separation of powers," in that Congress had overridden a determination by the District of Columbia Circuit Court that the FCC was justified in not awarding the markets to those three original selectees. To the extent that plaintiffs seek a declaratory judgment on the constitutionality of the Local TV Act of 2000, this court is not the proper forum to render such a pronouncement. *See Adair v. United States,* 227 Ct.Cl. 345, 353, 648 F.2d 1318, 1323–1324 (1981) (quoting *United States v. King,* 395 U.S. 1, 5, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)).

claim under the Fifth Amendment to the Constitution.

■ Nor do plaintiffs' claims meet the test for a regulatory taking. The United States Court of Appeals for the Federal Circuit has stated the test for a regulatory taking as follows:

a) A property owner who can establish that a regulatory taking of property has occurred is entitled to a monetary recovery for the value of the interest taken, measured by what is just compensation.

b) With regard to the interest alleged to be taken, there has been a regulatory taking if

(1) there was a denial of economically viable use of the property as a result of the regulatory imposition;

(2) the property owner had distinct investment-backed expectations; and

(3) it was an interest vested in the owner, as a matter of state property law, and not within the power of the state to regulate under common law nuisance doctrine.

*Loveladies Harbor, Inc. v. United States,* 28 F.3d at 1179. Applying the second prong of this test to the case before this court, plaintiffs have failed to demonstrate that they could have had distinct investment-backed expectations of static, FCC application procedures, and, therefore, have failed to meet the test for a regulatory takings.

Plaintiffs in a highly regulated field such as FCC licensing can have no distinct investment-backed expectations that include a reliance upon a legislative and regulatory status quo. *See Fed. Hous. Admin. v. Darlington, Inc.,* 358 U.S. 84, 91, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958), *reh'g denied,* 358 U.S. 937, 79 S.Ct. 310, 3 L.Ed.2d 311 (1959) ("Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end."); *see also Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 646, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (" '[L]egislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations ... even though the effect of the legislation is to impose a new duty or liability based on past acts,' Concrete Pipe's reliance on ERISA's original limitation of contingent liability to 30% of net worth is misplaced, there being no reasonable basis to expect that the legislative ceiling would never be lifted.") (*quoting Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) (footnotes omitted; alteration in original)); *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 222–23, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (Appellants' assertion that "a statutory liability to a private party always constitutes an uncompensated taking prohibited by the Fifth Amendment—if accepted, would prove too much. In the course of regulating commercial and other human affairs, Congress routinely creates burdens for some that directly benefit others."); *Commonwealth Edison Co. v. United States,* 271 F.3d 1327, 1349, 1354 (Fed.Cir.2001), *cert. denied,* 535 U.S. 1096, 122 S.Ct. 2293, 152 L.Ed.2d 1051 (2002); *Avenal v. United States,* 100 F.3d 933, 937 (Fed.Cir.1996), *reh'g denied* (1997); *Branch v. United States,* 69 F.3d 1571, 1581 (Fed.Cir. 1995), *cert. denied,* 519 U.S. 810, 117 S.Ct. 55, 136 L.Ed.2d 18 (1996); *Mitchell Arms, Inc. v. United States,* 7 F.3d 212, 216 (Fed.Cir. 1993), *cert. denied,* 511 U.S. 1106, 114 S.Ct. 2100, 128 L.Ed.2d 662 (1994); *Cal. Hous. Sec., Inc. v. United States,* 959 F.2d 955, 960 (Fed.Cir.), *cert. denied,* 506 U.S. 916, 113 S.Ct. 324, 121 L.Ed.2d 244 (1992) (" 'The instant case involves a regulatory action in a highly regulated industry in which the government took actions that reasonably should have been expected by plaintiffs ....' ") (*quoting Am. Cont'l Corp. v. United States,* 22 Cl.Ct. 692, 701 (1991)).

As noted earlier, "it is well-established that regardless of when an application is filed, an applicant [for a cellular license] has no vested right to a continuation of the licensing procedures in effect at the time its application was filed." *In re Implementation of Competitive Bidding Rules to License Certain RSAs,* 17 F.C.C.R.1960, 1971, 2002 WL 100245 (2002) (footnote omitted); *see also Bachow Communications, Inc. v. FCC,* 237 F.3d at 687–88; *PLMRS Narrowband Corp. v. FCC,* 182 F.3d at 1000–01 (finding that an applicant who filed an application under lottery rules did not thereby obtain a right to processing by

**62**

lottery); *Chadmoore Communications v. FCC*, 113 F.3d at 241 (The Commission's action could not have "impaired a right possessed by [Chadmoore] because none vested on the filing of its application.").

The FCC not only can change, but is expected to change, its rules and regulations to advance the public interest, or in response to congressional direction. The plaintiffs before the court could not reasonably have possessed distinct investment-backed expectations that the FCC was required to hold the scheduled re-lotteries under any and all circumstances. In sum, since the plaintiffs possess neither a property interest that could potentially be taken, nor could have held distinct, investment-backed expectations of static FCC application procedures, the plaintiffs' takings claims are rejected.

### CONCLUSION

Plaintiffs have failed to establish the existence of an implied-in-fact contract with the defendant. The court, therefore, **GRANTS** defendant's motion to dismiss for failure to state a claim upon which relief can be granted. Because this court does not have authority to review FCC licensing decisions, defendant's motion to dismiss for lack of subject matter jurisdiction also should be granted. Finally, plaintiffs do not hold a property interest protected by the Fifth Amendment and plaintiffs cannot demonstrate the requisite, distinct investment-backed expectations to support a takings claim. Therefore, defendant's motion to dismiss for failure to state a claim upon which relief can be granted with regards to plaintiffs' takings claim also is **GRANTED**. The Clerk's Office shall dismiss plaintiffs' complaint and enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED.**