SCHALL, Circuit Judge.
 

 Gene A. Folden, Coastal Communications Associates (“Coastal”), and Judith A. Longshore (collectively, “plaintiffs”) appeal the decision of the United States Court of Federal Claims (i) granting the United States’ motion to dismiss for failure to state a claim upon which relief could be granted, and (ii) granting the United States’ motion to dismiss for lack of subject-matter jurisdiction.
 
 Folden v. United States,
 
 56 Fed.Cl. 43 (2003). On the first point, the court determined that plaintiffs failed to state a claim for breach of contract because they were unable to establish the existence of an implied-in-fact contract with the government arising from their filing of lottery applications for cellular communication licenses with the Federal Communications Commission (the “Commission”).
 
 Id.
 
 at 51-55. On the second point, the court determined that it lacked subject-matter jurisdiction over plaintiffs’ claims because it concluded that decisions ancillary to the licensing power of the Commission fall within the exclusive jurisdiction of the United States Court of Appeals for the District of Columbia Circuit pursuant to 47 U.S.C. § 402(b).
 
 Id.
 
 at 55-60.
 

 We agree with the Court of Federal Claims that plaintiffs’ claims are covered by subsection 402(b), which places them within the exclusive jurisdiction of the D.C. Circuit. Accordingly, we affirm the court’s dismissal for lack of subject-matter jurisdiction.
 

 BACKGROUND
 

 I.
 

 We begin by setting forth the evolution of the regulatory regime by which the Commission issues telecommunications licenses, for it is essential to understanding plaintiffs’ theory of recovery in the case. By statute, the Commission is charged
 
 *1347
 
 with granting applications for licenses if it finds that “public interest, convenience, and necessity would be served by the granting thereof . . . .” 47 U.S.C. § 309 (2000). To facilitate the allocation of cellular licenses, the Commission divided the United States into two geographic markets — metropolitan statistical areas (MSAs) and rural service areas (RSAs).
 
 Folden,
 
 56 Fed.Cl. at 44. In each type of market, the Commission granted two competing licenses: one to a wireline operator, an established local telephone company, and the other ... to a nonwireline operator, any party other than an established local telephone company.
 
 Id.
 
 Plaintiffs are nonwireline operators in seven RSA markets.
 
 Id.
 

 To award the first thirty MSA cellular licenses, the Commission employed comparative hearings.
 
 [1]
 

 See Certain Cellular Rural Service Area Applications,
 
 14 F.C.C.R. 4619, 4619 (1999). In 1981, however, through an amendment to the Communications Act of 1934 (Communications Act), Congress authorized the Commission to allocate licenses by a system of random selection or lottery.
 
 See
 
 Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97-35, ch. 2, 1242, 95 Stat. 357, 736-37 (1981) (codified at 47 U.S.C. 309(i)). The House of Representatives conference report explained that [b]y the establishment of basic qualifications and the elimination of initial comparative hearings, the conferees intend that much of the present delay and expense can be eliminated with no adverse effect on the provision of services to the public. H.R. Conf. Rep. No. 97-208, at 897,
 
 reprinted in
 
 1981 U.S.C.C.A.N. 1010, 1259. However, despite agreeing that a lottery would speed service to the public, the Commission declined to adopt a lottery process for allocating telecommunications licenses.
 
 Selection from Among Mutually Exclusive Competing Applications Using Random Selection or Lotteries Instead of Comparative Hearings,
 
 89 F.C.C.2d 257, 258, 282-83 (1982) (explaining that although it was clear that Congress intended for the Commission to implement lotteries, various considerations led the Commission to conclude that “the public interest would best be served by declining to implement this statute”).
 

 In response, Congress passed a revised lottery statute, which imposed upon the Commission the mandatory requirement that lottery rules and procedures be adopted within 180 days. Communications Amendments Act of 1982, Pub.L. No. 97-259, § 115, 96 Stat. 1087, 1094-95 (1982) (codified at 47 U.S.C. § 309(i) as amended); H.R. Conf. Rep. 97-765, at 38,
 
 reprinted in
 
 1982 U.S.C.C.A.N. 2261, 2282 (“1982 Conf. Rep.”). Congress instructed that upon selecting a lottery winner, the Commission was to determine whether the winner was qualified pursuant to 47 U.S.C. §§ 308(b), 309(a) (2000).
 
 [2]
 
 1982 Conf. Rep.
 
 *1348
 
 at 39,
 
 reprinted in
 
 1982 U.S.C.C.A.N. at 2283. If the initial winner was determined to be unqualified, the Commission was to conduct a subsequent lottery ... with the same applicant pool with each applicants selection probabilities recomputed as necessary
 
 . . . . Id.
 

 In 1984, the Commission adopted rules for awarding cellular licenses by lottery. 47 C.F.R. 1.821-1.823, 22.33 (1984);
 
 see also Selection from Among Mutually Exclusive Competing Cellular Applications Using Random Selection or Lotteries Instead of Comparative Hearings,
 
 98 F.C.C.2d 175, 175, app. B (1984) (explaining the amendments to the regulations providing for the use of lotteries for awarding cellular licenses). Pursuant to the regulations, the Commission was allowed to employ a random selection process, or lottery, to choose the “tentative selectee” from among mutually exclusive license applicants. 47 C.F.R. § 1.822(b). Once the tentative selectee was named, the lottery continued with each of the remaining applicants, with the Commission ranking them in the order in which they were selected as “alternative selectees.”
 
 Id.
 
 The Commission would award the license to the tentative selectee only after determining that it was qualified.
 
 Id.
 
 If it were not, the Commission would name the next-ranked alternative selectee as the new tentative selectee and then evaluate its qualifications, repeating the process until the license was awarded.
 
 Id.
 

 In 1988, the Commission amended the rules pertaining to lotteries. Under the amended regulations, after the tentative selectee was named, each remaining applicant was no longer to be randomly selected and ranked in order of selection. Rather, in accordance with the amended version of 47 C.F.R. § 1.823(a), the Chief of the Common Carrier Bureau and the Managing Director of the Commission were to determine, on a case-by-case basis, the number of remaining applicants to be selected, and thus ranked as alternative selectees, in each lottery. 47 C.F.R. § 1.823(a) (1989);
 
 Selection from Among Mutually Exclusive Competing Applications Using Random Selection or Lotteries in the Public Land Mobile and Domestic Cellular Radio Telecommunications Services,
 
 4 F.C.C.R. 7294 (1988).
 

 This was the state of the regulatory regime when plaintiffs filed their applications for cellular licenses in 1988.
 

 II.
 

 We now turn to the process by which plaintiffs applied for cellular licenses. On May 19, 1988, the Commission issued a list of the 428 RSAs for which lotteries would be held and identified the counties that comprised each RSA.
 
 Listing of Cellular Rural Service Areas With Component Parts,
 
 53 Fed.Reg. 18,133 (Dep’t Commerce May 10, 1988). Plaintiffs submitted applications to the Commission for cellular licenses in seven RSAs. Mr. Folden applied for a cellular license in the Florida 11-Monroe (“Fla.11”) RSA on Nov. 4, 1988, and submitted a $200 filing fee.
 
 Folden,
 
 56 Fed.Cl. at 45. Coastal submitted a $1400 filing fee with its applications for cellular licenses in the following seven RSAs: Fla. 11 (filed Nov. 4, 1988), North Dakota 3-Barnes (“N.D.3”) (filed Sept. 9, 1988), Minnesota 11-Goodhue (“Minn.11”) (filed Sept. 16, 1988), Texas 21-Chambers (“Tex.21”) (filed Oct. 7, 1988), Arkansas 9-Polk (“Ark.9”) (filed Oct. 28, 1988), Puerto Rico 5-Ceiba (“P.R.5”) (filed Nov. 10,
 
 *1349
 
 1988), and Pennsylvania 4-Bradford (“Pa.4”) (filed Dec. 9, 1988).
 
 Id.
 
 Finally, Michael D. Longshore, the now deceased husband of Ms. Longshore, paid $800 in filing fees for his applications in the N.D. 3, Minn. 11, Tex. 21, and Pa. 4 RSAs.
 
 Id.
 

 The Commission issued lottery notices naming plaintiffs among those whose applications had been accepted for filing and providing the date upon which each lottery would occur. The lottery notices explained that each application had been assigned a code number, and that one code number would be drawn for each RSA. Furthermore, each notice stated, “In the event that the application selected cannot be granted, another lottery will be held for that market and another application will be selected from the remaining applications.”
 

 Lotteries for the seven licenses were held on the following dates in 1989: April 13 (N.D.3), May 4 (Minn.11), June 14 (Tex.21), August 9 (Ark.9), August 23 (Fla.11), September 20 (P.R. 5), and November 8 (Pa.4). Am. Class Action Compl., ¶¶ 32-39. Only one applicant, the tentative selectee, was chosen in each lottery; none of the plaintiffs was chosen as a tentative selectee.
 
 Folden,
 
 56 Fed.Cl. at 45. Competing applicants for these seven licenses subsequently opposed the tentative selectees in proceedings before the Commission. Am. Class Action Compl., ¶¶ 40. The Commission ultimately determined that none of the tentative selectees was qualified, and their applications were dismissed.
 
 [3]
 

 Folden,
 
 56 Fed.Cl. at 45.
 

 On January 29, 1992, the Commission announced that it would hold relotteries for twenty-nine RSAs, including Tex. 21, on April 8, 1992. This relottery notice stated, “The new lotteries will be conducted among the applications which have already been filed for these markets, minus the dismissed applications. No new applications for these markets will be accepted.” As had been the case in the original lottery, each application was to be assigned a code number, only one code number would be drawn for each RSA, and “[i]n the event that the application selected cannot be granted, another lottery will be held for that market and another application will be selected from the remaining applications.” The Tex. 21 relottery was held on April 8, and on April 9, the Commission issued the results; neither Coastal nor Mr. Longshore was chosen as the new tentative selectee. However, the new tentative selectee, Alee Cellular Communications (“Alee”), was later disqualified by the Commission on July 24,1994, and its application was denied. Due in part to events that followed, the Commission never conducted a second relottery for the Tex. 21 RSA.
 

 III.
 

 While plaintiffs’ applications were still pending before the Commission, Congress intervened in the process. In 1993, Congress added subsection 309(j) to the Communications Act of 1934. The Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103-66, tit. VI, § 6002(a), 107 Stat. 312, 387-92 (1993) (codified at 47 U.S.C. § 3090')) (“Auction Statute”). Subsection 309(j) authorized the Commission to use auctions as a method of selecting among mutually exclusive applications for cellular
 
 *1350
 
 licenses. The statute also permitted the Commission to continue to use lotteries for applications accepted for filing prior to July 26, 1993.
 
 Id.
 
 § 6002(e)(2), 107 Stat. at 397.
 

 On March 8, 1994, the Commission adopted rules for implementing the Auction Statute. 47 C.F.R. §§ 1.2101-1.2111 (1994);
 
 Implementation of Section 309(j) of the Communications Act
 
 — Competitive
 
 Bidding,
 
 9 F.C.C.R. 2348 (1994). For those applications filed prior to July 26, 1993, such as plaintiffs’, the Commission decided to continue to use lotteries, rather than auctions, to resolve pending applications for cellular unserved areas.
 
 Implementation of Section 3090) of the Communications Act
 
 — Competitive
 
 Bidding,
 
 9 F.C.C.R. 7387, 7390-93 (1994). Accordingly, in August 1994, the Commission issued a revision of its licensing rules:
 

 Pending applications for authority to operate the first cellular system on a channel block in an MSA or RSA market continue to be processed under the rules governing the processing of such applications that were in effect when those applications were filed, unless the Commission determines otherwise in a particular case.
 

 Revision of Part 22 of the Commission’s Rules Governing the Public Mobile Services,
 
 9 F.C.C.R. 6513, app. B (1994) (setting forth 47 C.F.R. § 22.959 (1995)). At the time plairftiffs’ applications were filed in 1988, 47 C.F.R. § 22.33 provided for the use of lotteries to distribute cellular licenses.
 

 On July 12, 1996, the Commission issued a relottery notice for six of the seven RSAs at issue (Ark. 9, Fla. 11, Minn. 11, N.D. 3, Pa. 4, and P.R. 5), setting the relottery date for September 18, 1996. As it had done in the case of the January 29, 1992 relottery notice for the Tex. 21 RSA, the Commission explained that each application had been assigned a code number, that only one code number would be drawn for each unserved area, and that “[i]n the event that the application selected cannot be granted, another lottery will be held for that unserved area and another application will be selected from the remaining applications.”
 

 However, on September 9, 1996, just before the relotteries were to be held for these six RSA licenses, Cellular Communications of Puerto Rico (“CCPR”) filed an
 
 ex parte
 
 petition requesting that the Commission issue a declaratory ruling that an auction, as opposed to a lottery, would be employed for the P.R. 5 RSA.
 
 Folden,
 
 56 Fed. Cl. at 47. In the alternative, CCPR requested that the Commission initiate a rulemaking proceeding to determine whether an auction should be used for this market.
 
 Id.
 
 On September 10, the Commission’s Wireless Telecommunications Bureau (the “Bureau”) issued a public notice postponing the six relotteries.
 
 Wireless Telecommunications Bureau Postpones Cellular Telecommunications Service Lottery for Rural Service Areas,
 
 FCC Public. Notice, Mimeo No. 65051 (Sept. 10, 1996). On October 24, 1996, the Bureau issued the following explanation:
 

 [CCPR’s] petition raises issues concerning the broader applicability of the use of competitive, bidding to award cellu]ar licenses for RSAp for which applications were filed prior to July 26, 1993, where the original tentative selectee has been disqualified and no license has been awarded to date. We will therefore treat CCPR’s petition as a petition for rulemaking, and request comment on it, as well as on The applicability of awarding eellular/market licenses via competitive bidding ip all cellular markets for which applications were filed with the Commission prior to July 26, 1993, and the original lottery winner has been disqualified.
 

 
 *1351
 

 Cellular Communications of Puerto Rico, Inc. Petition for Declaratory Ruling or Rulemaking to Determine Whether Competitive Bidding Procedures Should Be Used to License Certain Cellular Rural Service Areas,
 
 FCC Public Notice, DA 96-1685 (Oct. 24, 1996)
 
 (“CCPR Petition”).
 

 IV.
 

 Unsatisfied with the Commission’s response to its action allowing for the use of auctions rather than lotteries, Congress again injected itself into the licensing process. On August 5, 1997, Congress passed the Balanced Budget Act of 1997, which repealed section 6002(e) of the Auction Statute, which had preserved the Commission’s ability to use lotteries for applications filed prior to July 26, 1993. In addition, Congress terminated the Commission’s authority to hold lotteries for any license applications except applications for noncommercial educational and public broadcast stations. Balanced Budget Act of 1997, Pub.L. No. 105-33, tit. III, § 3002(a)(2)(B), (a)(4), 111 Stat. 251, 258, 260 (1997) (codified at 47 U.S.C. § 309(i)(5)) (“1997 Budget Act”). Following Congress’ action, the Bureau dismissed all pending cellular lottery applications for the following six RSAs: N.D. 3, Minn. 11, Ark. 9, Fla. 11, P.R. 5, and Pa. 4.
 
 Certain Cellular Rural Service Area Applications,
 
 14 F.C.C.R. 4619 (1999). The Bureau further determined that the applicants did not qualify for refunds of their filing fees.
 
 Id.
 
 at 4621. The Coastal and Longshore applications for the Tex. 21 RSA were similarly dismissed without a refund of their filing fees by the Bureau.
 
 Certain Cellular Rural Service Area Applications in Market Nos. 599A and 672A,
 
 No. DA 99-814 (Apr. 29, 1999). Plaintiffs’ request for reconsideration of the dismissals was denied by the Bureau.
 
 Certain Cellular Rural Service Area Applications in Market Nos. 599A and 672A
 
 16 F.C.C.R. 4860 (2001).
 

 Congress subsequently reinstated the original tentative selectees for three of the seven RSAs at issue on December 21, 2000. Launching Our Communities’ Access to Local Television Act of 2000, Pub.L. No. 106-553, tit. X, § 1007, 114 Stat. 2762A-128, 2762A-138-40 (“Local TV Act”). In accordance with the statute, the Commission announced on March 16, 2001, that licenses for the Fla. 11, Minn. 11, and Pa. 4 RSAs had been granted to the original tentative selectees.
 
 Wireless Telecommunications Bureau Grants Rural Cellular Licenses,
 
 16 F.C.C.R. 5601 (2001).
 

 On January 13, 2001, the Commission proposed rules for auctioning cellular licenses in the four remaining RSAs at issue: Ark. 9, N.D. 3, Tex. 21, and P.R. 5.
 
 Competitive Bidding Rules,
 
 16 F.C.C.R. 4296 (2001). On January 16, 2002, the Commission adopted rules to govern auctions for licenses in these four RSA markets, in which no tentative selectee had been selected by relottery prior to July 1, 1997, and for which Congress had not directed the Commission to reinstate the original tentative selectee. 47 C.F.R. §§ 22.228-22.229, 22.969 (2002);
 
 Implementation of Competitive Bidding Rules to License Certain Rural Service Areas,
 
 17 F.C.C.R.1960 (2002). The interim operators
 
 [4]
 
 won the bidding for the Ark. 9, N.D. 3, and P.R. 5 licenses.
 
 Cellular Rural Service Areas Auction Closes,
 
 17 F.C.C.R. 10582 (2002). On November 1, 2002, a Commission Administrative Law Judge
 
 *1352
 
 dismissed the application of Alee, the winner of the relottery, for the Tex. 21 license.
 
 In re Application of Alee Cellular Communications for Authorization to Construct Nonwireline Cellular System in Texas RSA 21 Market 672A,
 
 WT Docket No. 02-28, File No. 11025-CL-P-672-A-89 (Nov. 1, 2002).
 

 V.
 

 A.
 

 Plaintiffs did not request review or reconsideration by the full Commission of the Bureau’s orders dismissing their applications.
 
 [5]
 

 Folden,
 
 56 Fed. Cl. at 48. Instead, they filed a class action complaint in the Court of Federal Claims, which they subsequently amended.
 
 Id.
 
 In their amended complaint, plaintiffs alleged breach of implied-in-fact contracts by the Commission, takings in violation of the Fifth Amendment, and unconstitutional takings of their contract rights in violation of Article III of the U.S. Constitution.
 
 [6]
 
 Plaintiffs sought to recover $144,088,000 in damages. In addition, plaintiffs filed a motion to certify a purported class consisting of all applicants whose applications the Commission had accepted in 1988 for the seven RSA licenses at issue, excluding those who were chosen as tentative selectees and subsequently disqualified.
 
 Id.
 
 The government responded by filing a motion to dismiss for lack of subject-matter jurisdiction or, in the alternative, for failure to state a claim upon which relief could be granted.
 
 Id.
 
 at 51. The court granted the government’s additional motion to stay consideration of plaintiffs’ request for class certification pending resolution of the motion to dismiss.
 
 Id.
 
 at 48.
 

 B.
 

 The Court of Federal Claims dismissed plaintiffs’ amended complaint for failure to
 
 *1353
 
 state a claim upon which relief could be granted.
 
 Id.
 
 at 51-55. The court assumed that it had jurisdiction to entertain plaintiffs’ breach of implied-in-fact contract claims, in part “because certain case precedent suggests that almost any implied-in-fact [contract] allegation gives [the Court of Federal Claims] jurisdiction to review such claims.”
 
 [7]
 

 Id.
 
 at 52. Reciting the elements of an implied-in-fact contract (mutuality of intent to contract, consideration, lack of ambiguity in offer and acceptance, and authority to bind the government), the court found lacking mutuality of intent to contract.
 
 Id.
 
 at 52-53. The court declined to adopt plaintiffs’ argument that 47 C.F.R. §§ 1.823 and 22.33(a) constituted contractual promises by the Commission to hold lotteries or relotteries.
 
 Id.
 
 at 53. Rather, because agency rules are subject to change in accordance with recognized procedures, especially when mandated by statute as in this case, and because the regulations did not prohibit the Commission from changing its lottery rules in the future in accordance with those recognized procedures, the court concluded that neither the regulations nor the lottery notices contractually bound the Commission to hold lotteries or relotteries within a definite time, before the statutory change occurred.
 
 Id.
 
 at 53-54.
 

 The court further relied upon 47 C.F.R. § 22.959 (1995), which provided for the award of cellular licenses by lottery “unless the Commission determines otherwise in a particular case.”
 
 Id.
 
 at 54. This demonstrated to the court that the Commission had not manifested a clear intent to be obligated to use lotteries.
 
 Id.
 
 The court also invoked the “well established rule” that an agency such as the Commission is permitted to modify its rules pursuant to rulemaking proceedings and must follow the mandates of Congress.
 
 Id.
 
 Specifically, the D.C. Circuit has ruled that the Commission has the discretion to change license allocation procedures midstream, though it may disrupt the applicants’ expectations and alter the competitive balance among them.
 
 Id.
 
 (citing,
 
 inter alia, Bachow Communications, Inc. v. FCC,
 
 237 F.3d 683, 687-88 (D.C.Cir.2001)). In conclusion, the court determined that “[t]he long tradition of Commission authority to change rules effectively precluded the FCC from making a contractual promise to the plaintiffs.”
 
 Id.
 
 at 55. Because plaintiffs could not establish the Commission’s intent to contract, the court ruled that plaintiffs’ claims for breach of implied-in-fact contracts failed.
 
 Id.
 

 C.
 

 The Court of Federal Claims also ruled in favor of the United States on its motion to dismiss for lack of subject-matter jurisdiction.
 
 Id.
 
 at 55-60. The court explained that 47 U.S.C. § 402(b) reserves judicial review of Commission licensing decisions exclusively for the D.C. Circuit.
 
 Id.
 
 at 56. Because the statutory term “station license” in subsection 402(b)(1) encompasses personal communications service (“PCS”) licenses, which, in turn, include licenses for cellular telephone service, the court concluded that an appeal by any applicant for a cellular license whose application is denied by the Commission falls within the scope of that subsection.
 
 Id.
 
 (citing
 
 NextWave Pers. Communications, Inc. v. FCC,
 
 254 F.3d 130, 140 (D.C.Cir.2001)). The court then explained that pursuant to
 
 Cook, Inc. v. United States,
 
 394 F.2d 84, 84-85 (7th Cir.1968), and
 
 Kessler v. FCC,
 
 
 *1354
 
 326 F.2d 673, 679 n. 4 (D.C.Cir.1963), and as confirmed by later D.C. Circuit decisions, subsection 402(b) extends to Commission decisions that are “ancillary” to the nine types of licensing decisions expressly enumerated therein.
 
 Folden,
 
 56 Fed. Cl. at 56-57. Plaintiffs’ claims, according to the court, involved a decision ancillary to those in subsection 402(b).
 
 Id.
 
 at 57.
 

 The court was unpersuaded by plaintiffs’ argument that the Bureau’s dismissals of their applications did not constitute final decisions of the Commission and therefore did not trigger subsection 402(b).
 
 Id.
 
 Plaintiffs also argued that because they were seeking money damages, the D.C. Circuit could not have had, and the Court of Federal Claims did have, jurisdiction over their claims.
 
 Id.
 
 at 57-58. The court concluded that plaintiffs’ attempt to circumvent established agency and federal court procedures “conjured a contract theory from the mere chance to obtain a cellular license following submission of their applications” in the absence of any contract negotiations and documents.
 
 Id.
 
 at 57. The court added that plaintiffs had offered no precedent to support their theory of an implied-in-fact contract.
 
 Id.
 
 at 59. Thus, the court found plaintiffs’ claims to be one of those “instances in which a claim that is otherwise within the court’s jurisdiction is so insubstantial on its merits that a dismissal may be termed jurisdictional.”
 
 Id.
 
 (quoting
 
 Lewis v. United States,
 
 70 F.3d 597, 603 (Fed.Cir.1995)). According to the court, “[t]o acknowledge the possibility of the existence of a contract under these circumstances for the purposes of jurisdiction, only to, ultimately, find no contract in existence, is to undermine statutory and regulatory procedures carefully designed to address grievances associated with FCC licensing applications.”
 
 Id.
 
 The court therefore dismissed plaintiffs’ claims for breach of implied-in-fact contracts.
 

 This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).
 

 ANALYSIS
 

 I.
 

 Whether the Court of Federal Claims properly dismissed plaintiffs’ amended complaint for lack of subject-matter jurisdiction is a question of law that we review
 
 de novo. W. Co. v. United States,
 
 323 F.3d 1024, 1029 (Fed.Cir.2003). Subject-matter jurisdiction may be challenged at any time by the parties or by the court
 
 sua sponte. Fanning, Phillips & Molnar v. West,
 
 160 F.3d 717, 720 (Fed.Cir.1998). In deciding whether there is subject-matter jurisdiction, “the allegations stated in the complaint are taken as true and jurisdiction is decided on the face of the pleadings.”
 
 Shearin v. United States,
 
 992 F.2d 1195, 1195-96 (Fed.Cir.1993).
 

 II.
 

 In this case, plaintiffs allege subject-matter jurisdiction in the Court of Federal Claims under the Tucker Act, which provides as follows:
 

 The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
 

 28 U.S.C. § 1491(a)(1) (2000). Although the Tucker Act waives the sovereign immunity of the federal government, it does not provide any substantive rights.
 
 United States v. Mitchell,
 
 463 U.S. 206, 216-17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). In order to invoke successfully the jurisdiction of the Court of Federal Claims pursuant to the Tucker Act, a plaintiff must
 
 *1355
 
 identify a right to money damages found in the Constitution, a statute or government regulation, or a contract.
 
 Id.
 

 To establish Tucker Act jurisdiction in this case, plaintiffs allege implied-in-fact contracts with the Commission. In their amended complaint, they assert that the Commission breached implied-in-fact contracts to hold relotteries to award cellular licenses for the seven RSAs at issue. Plaintiffs’ theory is as follows: The Commission released “offers,” in the form of public notices, requesting applications for the seven RSA cellular licenses that it planned to award by lottery. Plaintiffs “accepted” those offers by preparing and timely filing letter-perfect applications, and plaintiffs provided “consideration” by paying the requisite filing fees for the seven licenses in accordance with the Commission’s lottery rules and procedures. The Commission then issued lottery notices that named plaintiffs as among those whose applications had been accepted, constituting “public acknowledgement” that plaintiffs had fulfilled the necessary requirements to apply for the lotteries. The Commission further promised to hold re-lotteries for each of the seven RSA licenses should none of the initial winners be qualified, and the Commission confirmed this promise upon disqualifying the original tentative selectee in each of the seven RSAs.
 

 Plaintiffs contend that the Commission’s contractual obligations to conduct a relottery for each RSA license arose on the date that the initial lottery winner’s application was dismissed or denied. According to plaintiffs, the Commission breached those contracts when it failed to hold relotteries for six of the seven licenses for which plaintiffs had applied, and when it failed to hold a second relottery for the Tex. 21 RSA. For six of the RSA licenses, plaintiffs identify the date of the originally scheduled relotteries, September 18, 1996, as the date of the Commission’s breach. For the Tex. 21 RSA, plaintiffs identify April 17, 1997, as the date of the Commission’s breach, because between November 25, 1996, and April 17, 1997, plaintiffs assert, “various applicants made formal demands that re-lotteries be held for all remaining RSAs, including Tex. 21,” which the Commission allegedly ignored.
 

 Having explained plaintiffs’ theory of Tucker Act jurisdiction, we now turn to the statutory and regulatory regime of the Communications Act.
 

 III.
 

 A.
 

 Congress has vested the district courts with jurisdiction over enforcement of Commission orders. 47 U.S.C. § 401(b) (2000). At the same time, in 47 U.S.C. § 402, it has provided for judicial review of Commission decisions. Subsection 402(a) provides:
 

 (a) Procedure. Any proceeding to enjoin, set aside, annul or suspend any order of the Commission under this Act (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in [28 U.S.C. §§ 2342-2351].
 

 In turn, section 2342 of title 28 provides for the courts of appeals to have exclusive jurisdiction to “enjoin, set aside, suspend (in whole or in part), or to determine the validity of’ all final orders of the Commission made reviewable by subsection 402(a). 28 U.S.C. § 2342 (2000). Section 2343 sets the proper venue as either the judicial circuit in which the petitioner resides or has its principal office, or the D.C. Circuit.
 
 Id.
 
 § 2343.
 

 Subsection 402(b), by contrast, specifically provides for the D.C. Circuit to have jurisdiction with respect to the following Commission decisions:
 

 (b) Right to appeal. Appeals may be taken from decisions and orders of the
 
 *1356
 
 Commission to the United States Court of Appeals for the District of Columbia in any of the following cases:
 

 (1) By any applicant for a construction permit or station license, whose application is denied by the Commission.
 

 (2) By any applicant for the renewal or modification of any such instrument of authorization whose application is denied by the Commission.
 

 (3) By any party to an application for authority to transfer, assign, or dispose of any such instrument of authorization, or any rights thereunder, whose application is denied by the Commission.
 

 (4) By any applicant for the permit required by section 325 of this Act [47 USCS § 325] whose application has been denied by the Commission, or by any permittee under said section whose permit has been revoked by the Commission.
 

 (5) By the holder of any construction permit or station license which has been modified or revoked by the Commission.
 

 (6) By any other person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application described in paragraphs (1), (2), (3), (4), and (9) hereof.
 

 (7) By any person upon whom an order to cease and desist has been served under section 312 of this Act [47 USCS § 312],
 

 (8) By any radio operator whose license has been suspended by the Commission.
 

 (9) By any applicant for authority to provide interLATA services under seetion 271 of this Act [47 USCS § 271] whose application is denied by the Commission.
 

 By their plain language, subsections 402(a) and (b) are mutually exclusive. When section 402 was amended in 1952 to its current form, the Senate Committee stated, “The language of this subsection [402(b)], when considered in relation to that of subsection (a), also would make it clear that judicial review of all cases involving the exercise of the Commission’s radio licensing power is limited to that court [the D.C. Circuit].” S.Rep. No. 44, at 10 (1951),
 
 cited in Cook,
 
 394 F.2d at 86. Appeals from all decisions of the Commission that do not fall within subsection 402(b) are encompassed by the procedures of subsection 402(a).
 
 See Columbia Broad. Sys. v. FCC,
 
 211 F.2d 644, 647 (D.C.Cir.1954).
 

 We think it clear that the D.C. Circuit’s jurisdiction over claims that fall within subsection 402(b) is exclusive.
 
 [8]
 
 The Supreme Court has ruled that the statutory jurisdiction of the courts of appeals over claims that fall within the scope of subsection 402(a) is exclusive.
 
 FCC v. ITT World Communications, Inc.,
 
 466 U.S. 463, 468, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984) (“Exclusive jurisdiction for review of final FCC orders, such as the FCC’s denial of respondents’ rulemaking petition, lies in the Court of Appeals.” (citing
 
 28 U.S.C. 2342
 
 (1);
 
 47 U.S.C. 402
 
 (a))). It follows that the D.C. Circuit’s jurisdiction pursuant to subsection 402(b) is also exclusive: subsections 402(a) and (b) comprise the entire statutory regime by which parties may obtain judicial review of Commission decisions.
 
 [9]
 
 Moreover, it has been long settled by the D.C. Circuit that its
 
 *1357
 
 jurisdiction over claims brought pursuant to subsection 402(b) is in fact exclusive.
 
 Sykes v. Jenny Wren Co.,
 
 78 F.2d 729 (D.C.Cir.) (concluding for the first time that the jurisdiction of the D.C. Circuit pursuant to subsection 402(b) is exclusive),
 
 cert. denied,
 
 296 U.S. 624, 56 S.Ct. 147, 80 L.Ed. 448 (1935);
 
 [10]
 

 City of Rochester v. Bond,
 
 603 F.2d 927, 932-35 (D.C.Cir.1979) (“In § 402 of the Communications Act ... Congress has, we think, prescribed the exclusive mode of judicial review of such controversies as this ....”) (relying on Sykes);
 
 Sprint Communications Co. L.P. v. FCC,
 
 274 F.3d 549, 552 (D.C.Cir.2001).
 

 In the Communications Act, Congress enacted a comprehensive statutory and regulatory regime governing orders of the Commission. Congress vested the district courts with jurisdiction over enforcement of Commission orders, 47 U.S.C. § 401(b), and the courts of appeal and the D.C. Circuit with jurisdiction over judicial review of such orders,
 
 id.
 
 § 402(a), (b). At the same time, section 155(c)(7) requires a party to appeal first within the Commission before pursuing a judicial remedy pursuant to section 402.
 
 Id.
 
 § 155(c)(7);
 
 see supra,
 
 note 5. Congress also imposed various filing deadlines for appeals from Commission orders, provided for interested parties to receive notice of an appeal, required appeals to include specific information, and prescribed the procedure by which an interested party may intervene in appeal proceedings.
 
 Id.
 
 § 402(c)-(e). We have explained that “[w]hen such a ‘specific and comprehensive scheme for administrative and judicial review1 is provided by Congress, the Court of Federal Claims’ Tucker Act jurisdiction over the subject matter covered by the scheme is preempted.”
 
 Vereda, Ltda v. United States,
 
 271 F.3d 1367, 1375 (Fed.Cir.2001) (quoting
 
 St. Vincent’s Med. Ctr. v. United States,
 
 32 F.3d 548, 549-50 (Fed.Cir.1994), and citing
 
 United States v. Fausto,
 
 484 U.S. 439, 454-55, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988);
 
 Appalachian Reg’l Healthcare, Inc. v. United States,
 
 999 F.2d 1573, 1577 (Fed.Cir.1993)).
 

 Plaintiffs contend, however, that the D.C. Circuit’s jurisdiction pursuant to subsection 402(b) and Tucker Act jurisdiction for the Court of Federal Claims may coexist. In making this argument, they rely on
 
 Cellco Partnership v. United States,
 
 54 Fed. Cl. 260 (2002). In
 
 Cellco Partnership, Ce
 
 llco, doing business as Verizon Wireless, filed suit against the government
 
 *1358
 
 in the Court of Federal Claims for breach of contracts allegedly formed when the Commission accepted its bid for reauctioned spectrum licenses. Célico asserted that the Commission failed to timely deliver the licenses. At the same time, pursuant to subsection 402(b), Célico appealed to the D.C. Circuit from the Commission’s order relating to the refund of Cellco’s down payment for the licenses.
 
 Id.
 
 at 261. Citing the possibility of inconsistent rulings by the two tribunals, the government moved to stay proceedings in the Court of Federal Claims, but the motion was denied. In denying the motion to stay, the court noted that the D.C. Circuit could decide that it lacked jurisdiction to decide the contract claim. It also noted that the D.C. Circuit lacked jurisdiction to decide Cellco’s money damages claim.
 
 Id.
 
 at 262-63.
 

 Plaintiffs’ reliance on
 
 Célico Partnership
 
 is misplaced. We are not bound by decisions of the Court of Federal Claims. In any event, to the extent that the decision suggests that the Court of Federal Claims may exercise concurrent jurisdiction with the D.C. Circuit over claims that fall within the scope of subsection 402(b), we reject it. The availability of concurrent jurisdiction in district court over claims under subsection 402(b) was explicitly rejected in
 
 City of Rochester,
 
 603 F.2d 927. While recognizing that subsection 402(b) did not specify whether concurrent jurisdiction in the district court could exist, the D.C. Circuit nevertheless concluded that it could not.
 
 Id.
 
 at 932. The court ruled that the plaintiffs’ suit to set. aside the Commission’s issuance of a construction permit, which is encompassed by subsection 402(b), could not be' brought in district court. The court’s logic applies with equal force to the possibility of concurrent jurisdiction in the Court of Federal Claims. The court stated:
 

 The principles which frame our decision are unexceptionable ... Congress, acting within its constitutional powers, may freely choose the court in which judicial review may occur.... If ... there exists a special statutory review procedure, it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies.
 

 The rationale for statutory review is that coherence and • economy are best served if all suits pertaining to designated agency decisions are segregated in particular courts. The choice of forum is, as we have said, for Congress . . . .
 

 Id.
 
 at 931 (citing
 
 City of Tacoma v. Taxpayers of Tacoma,
 
 357 U.S. 320, 336, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958));
 
 id. at 936. The court further noted that finding concurrent jurisdiction under a general jurisdictional mandate (such as the Tucker Act in this case) would completely undo the requirement of a timely petition for review and the finality of agency orders, which Congress deliberately chose to include in the statutory scheme, a choice [the court] may not second-guess. Id. at 935.
 
 Plaintiffs’ suit is indistinguishable from
 
 City of Rochester.
 

 In sum, if subsection 402(b) applies in this case, the D.C. Circuit had exclusive jurisdiction over plaintiffs’ claims.
 
 [11]
 
 It is to that question that we now turn.
 

 
 *1359
 
 B.
 

 1.
 

 Subsection 402(b)(1) applies to licensing decisions of the Commission, specifically, appeals by “any applicant for a ... station license, whose application is denied by the Commission.”
 
 [12]
 
 It is undisputed in this case that, strictly speaking, plaintiffs are not appealing from any formal denial of their applications, for plaintiffs do not contend that their applications for the seven RSA licenses were actually denied — only that the relotteries by which the Commission was allegedly obligated to award those licenses were canceled. Plaintiffs’ claims therefore do not fall within the literal language of subsection 402(b)(1). Nevertheless, in addition to the licensing decisions expressly enumerated therein, subsection 402(b) also extends to licensing decisions of the Commission that are “ancillary” to those set forth in subsections (1)-(9).
 
 See Tomah-Mauston Broad. Co. v. FCC,
 
 306 F.2d 811, 811-12 (D.C.Cir. 1962);
 
 Cook,
 
 394 F.2d at 84-85. The applicability of subsection 402(b)(1) to plaintiffs’ claims thus turns not on whether plaintiffs’ claims fall within the literal statutory language, but whether their claims fall within the scope of Commission licensing decisions that are ancillary to those set forth in subsection 402(b). The question before us, then, is whether the Commission’s failure to hold relotteries for the seven RSA licenses at issue is “ancillary” to the Commission’s decision to deny an applicant a station license under subsection 402(b)(1).
 
 [13]
 

 The Court of Federal Claims determined that subsection 402(b)(1) applied to plaintiffs’ claims.
 
 Folden,
 
 56 Fed. Cl. at 56-58. After reviewing the caselaw that extends subsection 402(b)(1) to Commission orders that are ancillary to an exercise of its licensing power under subsection 402(b), the court concluded, “Had the plaintiffs exhausted their administrative remedies, an appeal of the [Commission] decision would have been proper in the [D.C. Circuit], the court with statutory authority to review licensing decisions.”
 
 Id.
 
 at 57.
 

 On appeal, plaintiffs point to
 
 Freeman Engineering Associates, Inc. v. FCC,
 
 in which the D.C. Circuit determined that the Commission’s dismissal of certain prefer
 
 *1360
 
 ence applications was neither a denial of a license nor a matter ancillary to the denial of a license, and that therefore the dismissal did not fall within the scope of subsection 402(b). 103 F.3d 169, 177-78 (D.C.Cir.1997). Thus, plaintiffs argue that because no application for a license was formally granted or denied in the Commission’s decision not to hold relotteries for the seven RSA licenses, and because, to use plaintiffs’ words, “the dismissal orders were not ancillary to any [Commission] order granting or denying any license application,” subsection 402(b)(1) does not encompass their claims.
 

 In response, the government asserts that subsection 402(b)(1) does encompass plaintiffs’ claims, thereby providing the D.C. Circuit with exclusive jurisdiction. The government refers us to
 
 Cook,
 
 394 F.2d at 87, in which the Seventh Circuit held that orders returning the petitioner’s untimely license application were ancillary to an exercise of the Commission’s licensing power, and to
 
 Kessler,
 
 in which the D.C. Circuit held that it possessed exclusive jurisdiction to review a Commission order refusing to accept the appellants’ license applications. 326 F.2d at 679 n. 4. The government further cites,
 
 inter alia, Tomah-Mauston,
 
 306 F.2d at 812, which ruled that a Commission order denying a petition to stay and revoke a construction permit was ancillary to the grant of a construction permit, and
 
 Metropolitan Television Co. v. United States,
 
 221 F.2d 879 (D.C.Cir. 1955), which ruled that the D.C. Circuit possesses exclusive jurisdiction over orders denying protests and rehearing even though neither is specified in subsection 402(b).
 

 2.
 

 We agree with the Court of Federal Claims that subsection 402(b)(1) encompasses plaintiffs’ claims. In our view, a Commission decision not to hold relotteries is ancillary to the denial of a station license as set forth in subsection 402(b)(1).
 
 [14]
 

 With regard to the substance of subsection 402(b), the Senate Report explained in 1951, “The language of this subsection [402(b)], when considered in relation to
 
 *1361
 
 that of subsection (a), also would make it clear that judicial review of
 
 all cases involving the exercise of the Commission’s radio licensing power
 
 is limited to that court [the D.C. Circuit].” S.Rep. No. 44, at 10 (emphasis added). Relying on this language, the D.C. Circuit ruled as early as 1962 that appeals of Commission orders that are “ancillary” to those explicitly set forth in subsection 402(b) also fall within the scope of the statutory requirement that the D.C. Circuit have exclusive jurisdiction. Toma
 
 h-Mauston,
 
 306 F.2d at 811. The court in
 
 Tomah-Mauston,
 
 relied upon three previous cases: (i)
 
 Metropolitan Television,
 
 221 F.2d 879, in which the D.C. Circuit treated orders denying protests of a decision changing the frequency and power of a broadcasting station and orders denying rehearing as renewable under subsection 402(b), though neither is set forth in the statute; (ii)
 
 Federal Broadcasting Sys., Inc. v. FCC,
 
 239 F.2d 941 (D.C.Cir.1956), in which the court accepted jurisdiction pursuant to subsection 402(b)(6) over an appeal from the Commission’s grant of a petition requesting that authorization for a television permit remain in effect pending protest proceedings of that authorization; and (iii)
 
 Gerico Investment Co. v. FCC,
 
 240 F.2d 410, 411 n. 1 (D.C.Cir.1957), in which the court explained that ordinarily there is no question of the D.C. Circuit’s jurisdiction pursuant to subsection 402(b)(1) over an appeal from the grant of a construction permit and “orders ancillary thereto.” Armed with this precedent, the court in
 
 Tomah-Mauston
 
 determined that an appeal of a petition to stay and revoke a construction permit, while not expressly set forth in subsection 402(b), nevertheless fell within the exclusive jurisdiction of the D.C. Circuit. 306 F.2d at 811. Likewise, also relying on Senate Report No. 44, at 10, the Seventh Circuit adopted this position in
 
 Cook,
 
 holding that Commission orders returning an application and denying reconsideration of a return order are “ancillary” to the exercise of the Commission’s “licensing power.” 394 F.2d at 86-87.
 

 Perhaps most analogous to plaintiffs’ situation is
 
 Kessler.
 
 In that case, in a Report and Order issued on May 10, 1962, the Commission announced a “freeze” on the acceptance of applications for most classes of standard radio broadcast stations, effective at the close of business that day.
 
 Kessler,
 
 326 F.2d at 678. The Order explained that the Commission intended to “issue a notice of proposed rulemaking” related to the potential revision of its rules governing AM broadcast assignments.
 
 Id.
 
 Applicants had tendered their applications on or before June 15,1962, after the freeze order was issued but before it was published, and the applications were returnéd by the Commission unfiled.
 
 Id.
 
 at 686 n. 11. Applicants appealed the Commission’s refusal to accept their applications. The D.C. Circuit held that the Commission’s refusal to accept the applications fell within the ambit of subsection 402(b)(1) because, as the government argued and the applicants did not dispute, the freeze order “in effect denie[d] their applications.... ”
 
 Id.
 
 at 679 n. 4. Thus, the court exercised its jurisdiction pursuant to subsection 402(b)(1).
 
 Id.
 

 From these cases, we conclude that the Commission’s decision not to hold relotteries on September 18, 1996, for six of the RSA licenses, and its failure to hold a relottery for the Tex. 21 RSA license by April 17, 1997, constituted actions ancillary to the licensing power of the Commission, specifically to the denial of a station license set forth in subsection 402(b)(1).
 
 [15]
 
 We
 
 *1362
 
 think that the Commission’s failure to hold relotteries when plaintiffs had already filed their lottery applications is just as ancillary to subsection 402(b) as the Commission decisions set forth in the cases above. For example, in
 
 Kessler,
 
 the applicants had not even filed their applications; yet, the court held that the Commission’s refusal to accept their applications was ancillary to the denial of a license. Plaintiffs’ claims here are even more closely related to the decisions listed in subsection 402(b)(1): they had filed their applications for the seven RSA licenses some eight years earlier; thus, by failing to hold the relotteries, the Commission necessarily determined that plaintiffs’ lottery applications would not result in their receiving licenses. Rather than, as the court characterized it in
 
 Kessler,
 
 “in effect” denying their applications, the Commission here “in fact” denied plaintiffs’ lottery applications, albeit without issuing a formal order.
 

 Finally, plaintiffs rely upon
 
 Freeman Engineering
 
 and
 
 Waterway Communications Sys., Inc. v. FCC,
 
 851 F.2d 401 (D.C.Cir.1988). Neither case helps plaintiffs, however. In
 
 Freeman Engineering,
 
 the Commission had dismissed the appellants’ applications for “pioneer’s preferences,”
 
 [16]
 
 not applications for the licenses themselves. 103 F.3d 169. The appellants sought to challenge the action in the D.C. Circuit, which rejected the attempt. The court explained that subsection 402(b) did not apply because the “Commission does not grant licenses at the time a pioneer’s preference is awarded. Nor does the grant of a preference irrevocably commit the Commission to grant a license.”
 
 Id.
 
 at 174 (citing
 
 Waterway Communications,
 
 851 F.2d at 405). In contrast, plaintiffs’ lottery applications in this case
 
 were
 
 denied, along with any chance to receive a license by lottery, when the Commission decided not to hold relotteries. In other words, once the Commission failed to hold relotteries, plaintiffs could not be awarded any of the RSA licenses on the basis of their lottery applications.
 

 Waterway Communications
 
 also is distinguishable from this case. Waterway Communications System, Inc. (‘Water-corn”) petitioned the Commission to deny the pending applications for certain licenses filed by its competitor, Radio Television of Louisiana, Inc. (“RTL”).
 
 Waterway Communications,
 
 851 F.2d at 402. The Commission rejected Watercom’s petition to deny, and its subsequent petition for reconsideration of the Commission’s rejec
 
 *1363
 
 tion of its petition, and directed that RTL’s applications be processed in the ordinary course of business.
 
 Id.
 
 at 403. Watercom attempted to appeal to the D.C. Circuit the Commission’s order denying its petition to deny RTL’s applications. The court, however, dismissed its appeal. Explaining that subsection 402(b), on its face, “requires as a trigger the grant or denial of a license application,” the court concluded that the Commission’s order neither was a final license grant, nor irrevocably committed the Commission to grant RTL the licenses.
 
 Id.
 
 Thus, according to the court, the order was not appealable pursuant to subsection 402(b).
 
 Id.
 
 at 403-04. Again, plaintiffs’ case is distinguishable; their license applications were denied when the Commission failed to hold relotteries.
 

 In sum, we conclude that the Commission’s failure to hold relotteries for the seven RSA licenses at issue was an action ancillary to the denial of an application for a station license, as set forth in subsection 402(b)(1). Therefore, subsection 402(b) provided for jurisdiction in the D.C. Circuit over plaintiffs’ claims had there been exhaustion of administrative remedies.
 

 CONCLUSION
 

 Plaintiffs’ amended complaint seeks judicial review of the Commission’s decision not to hold relotteries for the seven RSA licenses at issue. Such a decision by the Commission is ancillary to the denial of a license application, as set forth in 47 U.S.C. § 402(b)(1). For these reasons, plaintiffs’ claims are subject to the exclusive jurisdiction of the D.C. Circuit. We therefore affirm the Court of Federal Claims’ dismissal of plaintiffs’ suit for lack of subject-matter jurisdiction.
 

 AFFIRMED.
 

 [1]
 

 . Historically, the Commission conducted "comparative hearings” to determine which applicant would best serve the statutory goals of public interest, convenience, and necessity. In comparative hearings, the Commission examined and compared each applicant based on diversification of media control, integration of management and ownership, previous broadcast experience, character, financial capability, and minority ownership.
 
 See
 
 47 U.S.C. § 309;
 
 Policy Statement on Comparative Broadcast Hearings,
 
 1 F.C.C.2d 393 (1965).
 

 [2]
 

 . As noted above, section 309(a) requires the Commission to grant licenses by determining whether "the public interest, convenience, and necessity will be served by the granting of such application . . . . ” 47 U.S.C. § 309(a). Section 308(b) sets forth matters into which the Commission may inquire, including
 

 the citizenship, character, and financial, technical, and other qualifications of the applicant to operate the station; the ownership and location of the proposed station and of the stations, if any, with which it is proposed to communicate; the frequencies and the power desired to be used; the
 
 *1348
 
 hours of the day or other periods of time during which it is proposed to operate the station; the purposes for which the station is to be used....
 

 Id.
 
 § 308(b).
 

 [3]
 

 . The original tentative selectees for the Minn. 11, Fla. 11, and Pa. 4 RSAs were dismissed, for example, because their percentage of foreign ownership exceeded the then-applicable statutory limits as set forth in 47 U.S.C. § 310(b)(1), (3) and 47 C.F.R. § 22.4.
 
 In re Applications of Cellwave Telephone Services L.P., FutureWave General Partners L.P., and Great Western Cellular Partners,
 
 7 F.C.C.R. 5955 (1992). These dismissals were affirmed by the D.C. Circuit.
 
 Great W. Cellular Partners v. FCC,
 
 72 F.3d 919 (D.C.Cir.1995);
 
 Cellwave Tel. Servs. L.P. v. FCC,
 
 30 F.3d 1533 (D.C.Cir.1994).
 

 [4]
 

 . In the four RSAs in which Congress did not reinstate the original tentative selectees, Ark. 9, N.D. 3, Tex. 21, and P.R. 5, the Commission had granted interim operating authority, pending relotteries, to cellular telephone licensees in adjacent areas to provide service.
 
 Implementation of Competitive Bidding Rules to License Certain Rural Service Areas,
 
 16 F.C.C.R. 4296, 4301 & n. 21 (2001)
 
 (‘‘Competitive Bidding Rules ”).
 

 [5]
 

 . Plaintiffs were required to file a petition for review of the dismissal of their applications with the full Commission, as a condition precedent to judicial review of the agency’s decision. 47 U.S.C. § 155(c)(7) (2000). Section 155(c)(7) imposes this requirement for orders and actions taken pursuant to 47 U.S.C. § 155(c)(1). Subsection 155(c)(1) applies to orders that involve the Commission’s delegation of its functions. In this case, plaintiffs’ applications were dismissed by the Bureau, to which the Commission has delegated that function pursuant to 47 C.F.R. § 0.131. Accordingly, plaintiffs were required to comply with section 155(c)(7) in order to preserve their right to judicial review of the dismissal of their applications.
 
 See, e.g., Richman Bros. Records, Inc. v. FCC,
 
 124 F.3d 1302 (D.C.Cir. 1997) (dismissing the appeal because the petitioners had not sought review of the agency order by the full Commission as required by section 155(c)(7));
 
 Int’l Telecard Ass'n v. FCC,
 
 166 F.3d 387 (D.C.Cir.1999) (dismissing the appeal as premature because the Commission had not yet ruled on the pending petition for review).
 

 [6]
 

 . Plaintiffs' takings claim was based on the theory that the government took their contract rights without paying just compensation. Plaintiffs contended .that the Commission’s decision to cancel the relotteries for the seven RSAs at issue, in anticipation of congressional revocation of the Commission’s authority to hold lotteries for cellular licenses, violated the Takings Clause of the Fifth Amendment.
 
 Folden,
 
 56 Fed. Cl. at 60.
 

 Plaintiffs’ theory of a taking of their contract rights in violation of Article III was as follows: The D.C. Circuit affirmed the Commission’s decision that the original selectees for the Minn. 11, Fla. 11, and Pa. 4 RSAs were ineligible to hold the licenses.
 
 See supra,
 
 note 3. According to plaintiffs, these decisions of the D.C. Circuit “vested” in plaintiffs the contractual right to a relottery for those three RSA licenses. Plaintiffs allege that when Congress subsequently awarded the licenses for these three RSAs to the original selectees by statute, the government "unconstitutionally appropriated thefir] contract rights” by eliminating their chances of winning a relotteiy for the three RSAs.
 
 Folden,
 
 56 Fed. Cl. at 60.
 

 The Court of Federal Claims dismissed all of plaintiffs’ constitutional claims, and plaintiffs have chosen not to appeal that ruling.
 

 [7]
 

 . The court prefaced its initial assumption of subject-matter jurisdiction, however, with the caveat that “logically, plaintiffs’ complaint, based on FCC decisions to dismiss plaintiffs’ applications, should be reviewed in the United States Court of Appeals for the District of Columbia and not in this court.”
 
 Folden,
 
 56 Fed. Cl. at 52.
 

 [8]
 

 . Neither party contends that subsection 402(a) applies to plaintiffs’ claims; rather, the parties dispute whether plaintiffs' claims fall within the scope of subsection 402(b).
 

 [9]
 

 . We addressed the exclusivity of a statutory grant of jurisdiction in
 
 Amerikohl Mining, Inc. v. United States,
 
 899 F.2d 1210, 1215 (Fed.Cir.1990). Amerikohl filed suit in the United States Claims Court seeking reimbursement of reclamation fees allegedly paid in excess of the statutory requirement under the Surface Mining Control and Reclamation Act of 1977, 30 U.SC. §§ 1201-1328 ("SMCRA”).
 
 Ameri
 
 
 *1357
 

 kohl,
 
 899 F.2d at 1211. The government challenged the subject-matter jurisdiction of the Claims Court, arguing that pursuant to 30 U.S.C. § 1276(a)(1), the United States District Court for the District of Columbia had exclusive jurisdiction to consider challenges to regulations promulgated under SMCRA. The Claims Court agreed.
 
 Id.
 
 at 1212. We sustained the ruling on appeal after finding the statute plain and unambiguous in its grant of exclusive jurisdiction to the district court. We explained:
 

 Where "Congress specifically designates a forum for judicial review of administrative action, such a forum is exclusive, and this result does not depend on the use of the word 'exclusive' in the statute providing a forum for judicial review.”
 

 Thus, regardless of how Amerikohl characterizes the present action, Amerikohl is preeluded from challenging the validity of regulations promulgated under section 1276(a)(1) because it is in the wrong court....
 

 Id.
 
 at 1215 (quoting
 
 Getty Oil Co. v. Ruckelshaus,
 
 467 F.2d 349, 356 (3d Cir.1972),
 
 cert. denied,
 
 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973)). Similarly, if subsection 402(b) applies in this case, plaintiffs too are in the wrong court, having failed to follow the statutory scheme.
 

 [10]
 

 .
 
 Sykes
 
 followed earlier precedent similarly construing the predecessor of subsection 402(b), section 16 of the Radio Act of 1927, ch. 169, 44 Stat. 1166.
 
 E.g., White v. Fed. Radio Commn., 29 F.2d 113, 115 (N.D.Ill. 1928).
 

 [11]
 

 . The Court of Federal Claims explained, and it is conceded by plaintiffs, that the D.C. Circuit may not, now, take jurisdiction over their claims because of their failure to timely appeal within the Commission from the dismissal of their applications by the Bureau.
 
 Folden,
 
 56 Fed. Cl. at 57;
 
 see supra,
 
 note 5. For this reason, 28 U.S.C. § 1631 is not applicable because at the time plaintiffs filed suit in the Court of Federal Claims, the D.C. Circuit would not have had jurisdiction over their suit, as a result of their failure to timely appeal within the Commission.
 
 See Nat’l Ctr. for Mfg. Scis. v. United States,
 
 114 F.3d 196,
 
 *1359
 
 198 (Fed.Cir.1997) ("The federal transfer statute, 28 U.S.C. § 1631, provides that a court may transfer an action to another court if the transferor court lacks jurisdiction to hear the action
 
 and the transferee court would have had jurisdiction."
 
 (emphasis added)).
 

 [12]
 

 . Plaintiffs do not dispute the Court of Federal Claims’ conclusions (i) that the term "station license” encompasses PCS licenses,
 
 see NextWave,
 
 254 F.3d at 140; and (ii) that PCS licenses include licenses for cellular telephone service,
 
 see Freeman Eng’g Assocs., Inc.
 
 v.
 
 FCC,
 
 103 F.3d 169, 175 (D.C.Cir.1997).
 
 Folden,
 
 56 Fed. Cl. at 56 & n. 4;
 
 see also Mobile Communications Corp. v. FCC,
 
 77 F.3d 1399, 1403 (D.C.Cir. 1996) (holding that the term "station license” in subsection 402(b) encompasses PCS licenses);
 
 NextWave,
 
 254 F.3d at 140 (citing,
 
 inter alia
 
 47 U.S.C. §§ 153(42) (defining "station license” as "that instrument of authorization required ... for the use or operation of apparatus for transmission of energy, or communications, or signals by radio"), 153(33) (defining "communication by radio” as "the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds”)).
 

 [13]
 

 . Plaintiffs frame their challenge to the Commission’s action in terms of a claim for breach of contract. We have already held, however, that if subsection 402(b) applies in this case, it preempts Tucker Act jurisdiction. In analyzing whether subsection 402(b) applies, we must look to the true nature of plaintiffs' claim, not how plaintiffs characterize it. At root, plaintiffs’ action plainly represents a challenge to the Commission’s failure to hold relotteries for the seven RSA licenses at issue. It is on those terms that we approach the question whether subsection 402(b) applies to it.
 

 [14]
 

 . To the extent that plaintiffs contend that the Commission’s failure to hold relotteries was not an appealable "decision” or "order” as set forth in subsection 402(b)(1), we disagree. We conclude that the Commission’s decision was in fact an appealable order within the meaning of the statutory scheme.
 
 In re FCC, 217
 
 F.3d 125, 141 n. 10 (2d Cir.2000). In
 
 In re FCC,
 
 the Second Circuit concluded that a Public Notice of Auction of certain PCS licenses constituted an appealable order of the Commission.
 
 Id.
 
 While admitting that the Commission had “issued no order formally announcing the cancellation of the Licenses,” the court nevertheless determined that revocation of the licenses was made explicit in the filing before the bankruptcy court and “implicit in the Public Notice announcing the re-auction of the Licenses . . . . ”
 
 Id.
 
 The court thus concluded that "the FCC action in question is unmistakably regulatory in nature.”
 
 Id.
 
 In addition, the court explained,
 

 The FCC’s Notice announced that specified licenses — those formerly possessed by NextWave — were to be re-auctioned. It is easy to conclude that this “denies a right.”
 
 Illinois Citizens Comm. [for Broadcasting v. FCC],
 
 515 F.2d [397,] 402 [ (D.C.Cir. 1974) ]. And if that decision is appealable, its regulatory nature requires that it be appealed in the court of appeals.
 

 Id.
 
 Likewise, in this case, as seen above, the decision of the Commission not to hold relotteries was announced by public notice and subsequently explained in another public notice. At the same time, we have no difficulty concluding that the cancellation of the relotteries denied plaintiffs the ability to receive the licenses by lottery. Thus, we conclude that despite the absence of a formal "decision” or "order” by the Commission, the decision not to hold relotteries for the seven RSA licenses at issue constituted an appealable decision within the meaning of subsection 402(b).
 

 [15]
 

 . The examples of Commission decisions not falling within the scope of 402(b), to which plaintiffs analogize their situation, are not persuasive.
 
 Straus Communications, Inc. v. FCC,
 
 530 F.2d 1001 (D.C.Cir.1976), did not involve a decision by the Commission related to licensing, but rather an entirely unrelated
 
 *1362
 
 ruling as to whether certain remarks on a radio program fell within the scope of the personal attack rule.
 
 Campos v. FCC,
 
 650 F.2d 890 (7th Cir.1981), involved petitions to review Commission orders denying
 
 operator licenses,
 
 not station licenses, and the court correctly found that it therefore possessed jurisdiction pursuant to subsection 402(a). In
 
 Coalition for Noncommercial Media v. FCC,
 
 249 F.3d 1005 (D.C.Cir.2001), the court ruled that a challenge to the Commission’s decision to change the status of two television channels did not fall within the scope of subsection 402(b), because the case did not involve any decision by the Commission related to licensing, only the change in status of an existing license.
 

 [16]
 

 . The rules for pioneer’s preferences provide that if an applicant demonstrates that it "has developed an innovative proposal that leads to the establishment of a service not currently provided or a substantial enhancement of an existing service,” the applicant may receive a pioneer’s preference when the Commission adopts rules governing the new or enhanced service.
 
 Freeman Eng’g,
 
 103 F.3d at 174 (quoting 47 U.S.C. § 1.402(a)). "A preference 'effectively guarantees the innovating party a license in the new service (assuming it is otherwise qualified) by permitting the recipient of a pioneer's preference to file a license application without being subject to competing applications.’ ”
 
 Id.
 
 (quoting
 
 Establishment of Procedures to Provide a Preference to Applicants Proposing an Allocation for New Services,
 
 6 F.C.C.R. 3488, 3492 (1991)).